260      MEEKER *et al. v.* MEEKER.      [Sept. T.

Syllabus.

*Decree reversed.*

---

THEODORE MEEKER *et al.*

*v.*

ELIZABETH MEEKER.

1. TESTAMENTARY CAPACITY — *rule for determining.* It is a rule of law that a person who is capable of transacting ordinary business is also capable of making a valid will. The rule is the same in the case of a sale of property, and its disposition by will; and the usual test is, that the party be capable of acting rationally in the ordinary affairs of life. The derangement or imbecility to incapacitate a person from making a valid will must be of that character which renders him incapable of understanding the effect and consequences of his acts. It need not be that total obliteration of the mental faculties which prevents a party from reasoning correctly on all subjects, nor yet at all times, the want of power, upon correct premises, to arrive at correct conclusions; but it is that want of capacity which prevents a person from reasoning correctly and from understanding the relation of cause and effect in ordinary business affairs.

2. SAME — *evidence whether disease was inherited.* Where it was shown that a testator had three strokes of paralysis, one before the making of his will, from the effects of which he partially recovered, and the second shortly after making the will, and that the last resulted in his death, it was

*held,* on a contest of the will, that there was no error in excluding proof that the same disease had affected the testator's ancestors and blood relatives, as that could not show the effect of the malady on the mind.

3. SAME — *giving a daughter small portion, as bearing on the question.* The fact that a testator by his will gave a daughter a comparatively small portion of his estate, the proof showing that there had been an estrangement between them, cannot be considered as of any weight upon the question of his capacity to dispose of his property, or of undue influence having been used. In such cases it will be presumed that the testator has acted correctly, and had cause for making such disposition of his property, until the presumption is satisfactorily rebutted.

4. WILL — *presumption of undue influence.* The fact of the dependence of the testator upon his wife, caused by his enfeebled physical condition, and her kindness to him, would naturally lead to the belief that she would possess great influence over him ; but that, in connection with an unequal disposition of his property, will not be sufficient to overcome the presumption in favor of the finding of the jury that her influence was not improperly used.

5. CHANCERY PRACTICE — *effect of a verdict.* In this State the practice in respect to a verdict upon a feigned issue is, that the court may act on it or reject the finding, accordingly as it is satisfied or not with it. If the court believes it clearly wrong, it is its duty to disregard it, and have the issue retried, or find the issue itself. This rule does not apply to verdicts on issues required by statute to be submitted to a jury.

6. NEW TRIAL — *verdict in chancery case.* Where, by statute, an issue in a chancery suit is required to be submitted to a jury, the court will be governed by the same rules in granting a new trial, as at law, and the same presumptions will prevail as in favor of a verdict in an ordinary suit at law.

APPEAL from the Superior Court of Cook county ; the Hon. S. M. MOORE, Judge, presiding.

This was a bill in chancery, filed by Theodore and Elizabeth Bond against Elizabeth Meeker, to contest the validity of the last will and testament of Joseph Meeker, deceased, and also a codicil thereto. The material facts of the case appear in the opinion.

Messrs. SWETT & BARRY, for the appellants

Messrs. HERVEY, ANTHONY & GALT, for the appellee.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

Appellants filed their bill in the Superior Court of Cook county, against appellee, to set aside the will of Joseph Meeker, deceased, which was executed on the 13th day of May, 1871, and the codicil thereto attached, bearing date the 27th day of November of the same year. The grounds upon which it is sought to impeach the will are, first, the want of capacity in testator, when he executed these instruments, to make a testamentary disposition of his property; and on the further ground that appellee had, by undue influence over testator, procured these instruments to be made, which, it is claimed, were made contrary to his intention and desire, by reason of such undue influence.

Testator, at the time of his death, was about sixty-five years of age. Appellee was his third wife, and appellants were his children by his first, he having none by the two latter. He was married to appellant in April, 1865, and he died in January, 1872. About ten years before his death he had a paralytic stroke, from which he seemed to recover. He continued to attend to his business as usual. Again, in the summer of 1871, he had another stroke — the precise date is disputed — and he had a third in the following January, from which he died in about three days afterward.

A trial was had under the statute, and the jury found that when the will was made, testator had sufficient capacity to make it, but did not have the necessary capacity to make the codicil. They therefore found in favor of the will and against the codicil. A motion for a new trial was entered, but was overruled by the court, and a decree rendered on the verdict, establishing the will and setting aside the codicil. And from that decree complainants appeal to this court and assign various errors.

It is urged that the finding of the jury is against the evi-

dence, and that the court below should for that reason have granted a new trial.

There were between forty and fifty witnesses examined on each side, and some four or five more for appellants than for appellee. The witnesses were well acquainted with the deceased, and many of them had known him many years, as he was one of the old citizens of Chicago. As is usually the case, there was much diversity of opinion and conflict in the evidence. Most of appellee's witnesses regarded him up till about the time of his death, and until after the will was made, as of sound and disposing mind. On the contrary, appellants' witnesses generally regarded him of unsound mind prior to and at the time the will was executed. The witnesses seem, generally, on both sides, to have been intelligent and fair, and the difference of opinion seems to have been honest, and were influenced by a contrariety of judgment, and not by prejudice or undue motives, with perhaps a few exceptions.

This want of agreement among the great mass of men as to what constitutes insanity, or imbecility, has always existed, and perhaps will continue indefinitely. Even among the educated, and those who have devoted a lifetime to the study of the disease of insanity and the impairment and decay of the human intellectual faculties, with their causes, symptoms, prevention and cure, there is a want of harmony of views. Various theories are advanced and rules promulgated, but, owing to the impossibility of knowing what constitutes mind and in what manner it acts, it may, and probably will, be in the distant future, if ever, before any reliable knowledge on the subject in all of its parts can be attained. Within the last half century the question has attracted the attention of men of great ability, research, and observation, and considerable progress has been made; but as yet it can hardly be regarded as having been reduced to a science.

Various theories are propounded — some practicable and some impracticable. This test has been adopted by some :

that sanity must be regarded as a straight line, and all deviations from it prove insanity, in the degree and to the extent of departure. That the incapacity to reason logically, both deductively and inductively, is evidence of insanity, or at least a want of mental capacity. Whilst this may be true philosophically, yet it could never be adopted and applied to every day affairs among men. We find large numbers of persons whose minds do not run in straight lines, and who neither reason logically, deductively or inductively, on all or even a majority of subjects, and yet they are found to be able, capable and efficient business men in the various pursuits of life. To adopt the rule as stated, it is believed that but few would be found to be sane, or to have mental capacity according to that standard.

The business of the world must go on, and some practical test must be adopted by which it can be determined whether men are to be held responsible for their acts, and whether their contracts shall be enforced. And whether precisely accurate according to the laws of mind or not, public necessity requires the adoption of a rule that best subserves the interests and well-being of society. To adopt the rule just stated would be to hold that few, if any, could be convicted criminally, or be bound by their contracts, held to discharge their various duties to their country, to society, to their families, or even themselves. Until human nature shall advance to a greatly more elevated plane intellectually, such a rule could not be fully adopted, and acted upon and enforced, without interminable confusion, amounting to anarchy. It is believed that but few of those who have devoted themselves to the observation and study of the human mind, in both its normal and abnormal conditions, are inclined to propound such a rule. It is, in fact, believed by many that no fixed rule can be adopted embracing all cases, owing to the great difference in the physical and intellectual organization of individuals. Temperament, nervous force, and physical organizations differ in infinite degrees and variations, and these are all supposed to have either a direct or

remote influence on the intellectual powers.   If so, general rules must necessarily be limited in their application, and the exceptions, to some of them at least, will be numerous and various in their character.

The object in organizing government is the protection of the people from external and internal injury, oppression and wrong.   The political powers of modern governments are variously distributed, but the governed are left free to acquire, dispose of, and enjoy property, accumulate wealth, and enjoy its advantages, where the frame of the government is beneficent, and the laws are wisely and energetically enforced.   And all things which impede or obstruct the governed in the pursuit and enjoyment of these ends are pernicious to the body politic. To adopt a high and impracticable standard by which to test intellectual capacity to contract with others, and to use and dispose of property, would operate injuriously on communities, and retard commerce, trade, and in fact the entire business interests of the community.   Hence the government must adopt that rule which will best advance the interests of society, and protect the weak and intellectually feeble.   The rule, to operate beneficially to the whole people, must give large freedom for action, and exclude but the few.

It is upon this principle that all governments fix the periods at which the governed are made responsible for their acts toward their fellow men, and are bound by their agreements. Hence they are declared of age at one period to be punished for crime, at another to contract marriage, and at another to become liable to serve the government in repelling foreign invasion, and the suppression of internal strife and resistance to the laws, and still another and later period, where they are declared to be capable of entering into business, and of contracting in reference to all lawful subjects.   These rules are not thus fixed because it is supposed no one will be found before the period indicated capable of understanding and performing the duty, or exercising the right, or that none will be incapable

34—75TH ILL.

when the period arrives.   But these periods have been fixed because observation teaches that at these various periods all but the few are capable of performing the acts and discharging the duties imposed.

The law has, therefore, adopted the rule that, where persons have arrived at full age, the presumption must be indulged that they have the requisite capacity to enter into and bind themselves by all lawful engagements, and, among others, may dispose of their property by testament.   And to avoid their acts the presumption must be rebutted by showing a want of sufficient intellectual capacity to make the agreement, or the disposition of their property by will.   Like all other matters relating to the human mind, it is difficult to fix any precise, undeviating rule by which it can be determined when a person has mind and memory.   Insanity, dementia and imbecility assume such a great variety of manifestations, that no precise rule for the ascertainment of the extent of the malady can be propounded.   But it is a question of fact that must be found by a jury.

It is a rule of law, that a person who is capable of transacting ordinary business is also capable of making a valid will.   It is not required that he shall possess a higher capacity for that than for the transaction of the ordinary affairs of business.   A man capable of buying and selling property, settling accounts, collecting and paying out money, or borrowing or loaning money, must usually be regarded as capable of making a valid disposition of his property by will.   The rule is the same in the case of a sale of property, and its disposition by will.   And the usual test is, that the party be capable of acting rationally in the ordinary affairs of life.   The derangement or imbecility, to incapacitate the person from making a valid will, must be of that character which renders him incapable of understanding the effect and consequences of his acts.   It need not be that total derangement or obliteration of the mental faculties which prevents the party from reasoning correctly on all subjects, nor yet, at all times, the power, upon correct premises, to arrive

at correct conclusions; but it is that want of capacity which pre-
vents a person from reasoning correctly, and from understand-
ing the relation of cause and effect in ordinary business affairs.
*Lilly* v. *Waggoner*, 27 Ill. 395; *Myatt* v. *Walker*, 44 ib. 485.
And it is a question for the determination of the jury whether
the party was possessed of a disposing mind.

This is a statutory proceeding. The seventh section of the
statute of wills provides that: "If any person interested shall,
within three years after the probate of any such will, testament
or codicil in the county court aforesaid, appear, and by his or
her bill in chancery contest the validity of the same, an issue
at law shall be made up, whether the writing produced be the
will of the testator or testatrix or not, which shall be tried by a
jury in the circuit court of the county wherein such will, testa-
ment or codicil shall have been proven and recorded as afore-
said, according to the practice in courts of chancery in similar
cases." This section peremptorily requires that an issue at law
shall be formed, whether or not it is the will of the testator;
and it requires the issue to be tried by a jury. By the rules
of chancery practice the chancellor had the right to try and
determine all questions, both of law and fact, which arise upon
any subject over which it has complete jurisdiction. The trial
of a feigned issue forms no necessary appendage to the proceed-
ings of a court of equity ; but, with two or three exceptions, it
is entirely a matter of discretion in the court, which it will not
exercise without due deliberation. Daniell's Ch. Pr., vol. 2, p.
730. And one of the exceptions there named is in cases of an
heir at law, who is entitled to it as a matter of right.

In this State the practice has been for the chancellor, in all
cases where there has been a trial of a feigned issue, to act
upon it, or reject it and have it retried, as he might be satisfied
or not with the verdict. Where he believes the finding is
clearly wrong, it is his duty to disregard it, and to have the
issue retried, or proceed with the trial of the cause and find the
issue himself. This, of course, applies to cases where it is dis-

cretionary with the court to have an issue of fact formed, and not where the statute has declared that an issue shall be formed, and tried by a jury. Under such a statutory provision the issue must be found by a jury; but where the finding is manifestly wrong, the court should set it aside and award a retrial of the issue. On a motion for a retrial of such an issue the court should be governed by the same rules that obtain in granting new trials at law because the verdict is not supported by the evidence. *Gibbs* v. *Hooper,* 2 My. & Keen, 353.

In this class of cases the statute has prescribed the practice, and the court cannot find the issue; but, as in a trial at law, if the finding is clearly wrong, it is his duty, for the same reasons and on the same grounds, to grant a new trial. The English practice was more liberal in granting new trials than the courts of this country, for the reason that the issue was usually tried by another court, and was not seen or heard by the chancellor; but when the trial was before him, it is believed that a retrial was only granted as it would be in an ordinary trial at law. Under our practice the judge who is chancellor presides in trying the issue, and in hearing the cause should always set aside the verdict on the same grounds and for the same reasons that a new trial is granted at law. And the motions in both classes of cases should be heard and disposed of precisely alike, and the same presumptions should be indulged in both classes of cases. No reason is perceived why they should not, and all the reasons which occur to us favor the same presumptions. And such was, no doubt, the intention of the statute. This being true, the verdict in this case will be considered like any other trial at law; and a careful examination of the evidence shows that it is quite conflicting. A large number of witnesses give it as their opinion that the testator's mind was impaired, and a number of them regarded him as incapable of transacting business. Of these a large number were well acquainted with him. On the other hand, almost an equal number, and fully as intimately acquainted with him, give it as their opinion,

from seeing and conversing with him, that he was mentally entirely competent to transact business. With some of them he dealt, and with others he transacted other business. He superintended the building of a barn, collected rents, borrowed a large sum of money, and no one seems then to have suspected that he was mentally incapacitated from transacting his business. Had the person who loaned him the $10,000 for a moment suspected that he was not of sound mind, he would most assuredly have not made the loan. On the facts appearing in evidence we are clearly of the opinion that the evidence warranted the verdict and preponderates in its favor; and the court did not err in refusing to set it aside.

There are but few circumstances proved which tend to show that Mrs. Meeker used any undue influence over testator. In his enfeebled physical condition she manifestly had, to a large extent, control of his person, as it was only by her assistance that he was enabled to travel around the neighborhood of his residence during the latter period of his life. Whilst it is natural to suppose that, owing to the relation that existed between them, and owing to his enfeebled condition and his large dependence upon her for his comforts, she would, if kind to him, have great influence over him; but we should not for that reason, even in view of the disposition he made of his property, presume against the finding of the jury that her influence was improperly exercised.

There seem to have been two stages of his disease. From the first stroke of paralysis he seemed to have almost recovered. And the evidence tends to show that he made his will about a month before the second stroke, and this the jury seem to have found, as they found in favor of the will, and against the codicil, which was made several months after the second stroke. There seems to have been a great difference in his condition before and after this second stroke. Although he attended to his business after as before, he was physically and mentally weaker after that attack. . Whether we should have regarded

it sufficient to require a different result in the finding as to the two instruments, it is not important to determine, as the fact has been found by the jury, whose province it was to determine that question.

We infer that there had been some variance between testator and Mrs. Bond, but that it was perhaps reconciled; but whether the original cordial affection between them as parent and child was restored does not distinctly appear. This, no doubt, accounts for the fact that he gave her a comparatively small portion of his estate. In making such dispositions of property, none can know but the testator all the reasons that operate in making such provisions. Kind and respectful attentions, and ministrations to the wants and infirmities of age, necessarily have their influence in favor of persons bestowing them; on the other hand, negligence, inattention, and want of respect produce the opposite effect. Nor can any but the parties themselves ever know or fully appreciate their extent. The veil that screens the affairs of private and family life is seldom raised, and the inharmony and strifes, if they exist, in the family circle, and its secret cares, troubles, and want of harmony are seldom exposed to the public. Hence it is seldom that others can have the basis upon which to determine accurately of the precise justice of such provisions, and consequently it must be presumed that the testator, knowing and feeling their force, has acted correctly, until the presumption is satisfactorily rebutted.

It is urged that the court erred in refusing to permit appellants to prove that paralysis had affected his ancestors and near blood relations. We fail to see the pertinency of this evidence. It stood not only proved, but confessed, that testator had three strokes of the disease and died from the effects of the last. In what manner such evidence would shed light on the question is not apparent. Had it been a question of doubt whether he had been affected by that disease, then we could see its pertinency; but where the fact is not disputed, how could it tend to show the

extent or effects of the first or second attack? Its effects, we apprehend, depend largely on the severity of the attacks and their nearness to each other, and must be shown by the effect they produce on the body and mind, as manifested subsequently, and not from the fact that it was inherited or accidental. The disease, all admit, was present, and those who saw and associated with him could see and judge of its results. There was, therefore, no error in excluding this evidence.

It is next urged that the court below erred in giving instructions. A careful consideration of those given for appellee fails to disclose any wrong proposition of law announced. We think they fairly present that side of the case. And the instructions given for appellants are fully as favorable as the facts upon which they were based would warrant. We think, both series considered, the law was fairly and fully given to the jury. Nor was there any error in refusing those asked by appellants. Some of them were clearly erroneous, and, in so far as they contained correct legal propositions, they were embodied in those which were given. On the entire record we fail to find any error, and the decree of the court below must be affirmed.

*Decree affirmed.*