# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ILLINOIS.

THOMAS ENTWISTLE et al.

v.

ELIZABETH MEIKLE et al.

*Opinion filed June 17, 1899.*

1. WILLS—*usual test of mental capacity is ability to act rationally in ordinary affairs of life.* One able to transact ordinary business, make leases, collect rents, purchase real estate and look after his investments is ordinarily capable of making a will.

2. SAME—*evidence must preponderate against verdict to authorize setting it aside.* The verdict of a jury in a will case has the same force as a verdict in a suit at law, and will not be disturbed on appeal where testimony is conflicting and not clearly against the verdict.

3. SAME—*certificate of oath of witnesses at time of probate is admissible on contest.* The certificate of the oath of witnesses at the time of the probate of the will may be read in evidence by the proponents in a proceeding to contest the will.

4. SAME—*attesting witnesses may testify on contest.* The attesting witnesses of a will are competent to testify, on contest, upon the question of the testator's mental capacity.

5. EVIDENCE—*what is not proper cross-examination in a will contest.* Proponents' witness having testified as to the testator's mental capacity in business transactions during a period of several years

before and after the execution of the will, the contestants cannot, on cross-examination, extend their inquiry to cover the full period up to the testator's death.

6. SAME—*when record of appointment of conservator may be denied admission.* The records of the county court showing the appointment of a conservator for the testator some years after the execution of the will in contest are properly denied admission.

7. INSTRUCTIONS—*instructions need not present abandoned issues.* An instruction in a will contest may omit reference to the question of undue influence although the latter is charged in the bill, where that issue is regarded as abandoned, no evidence having been introduced in support thereof.

8. BURDEN OF PROOF—*burden is on contestants after proponents have made a prima facie case.* It is incumbent upon the proponents of a contested will to make a *prima facie* case by proof of due execution by the testator and of his mental capacity, but the burden is then upon the contestants to overcome the *prima facie* case so made, by proving the allegations of their bill.

9. SAME—*evidence against testamentary capacity must preponderate.* In order for the jury to find against the validity of a will on the ground of mental incapacity it is not sufficient that the evidence raises a doubt as to the testator's sanity, as the evidence must preponderate upon that question.

APPEAL from the Circuit Court of Ford county; the Hon. G. W. PATTON, Judge, presiding.

This was a bill in chancery filed October 14, 1898, in the circuit court of Ford county, by Thomas Entwistle, James Entwistle and the children of John Entwistle, deceased, to set aside the will of James Entwistle, deceased. Thomas Entwistle and James Entwistle are sons, and the children of John Entwistle, the other complainants, are children of a deceased son of the testator. The defendants are Elizabeth Meikle, a daughter, and George Entwistle and William Henry Entwistle, also sons of the testator.

The bill charges that the will was executed and attested on May 31, 1894; that the testator died on the 17th day of March, 1898, and that the will was thereafter probated in the county court of Ford county on the second day of May, 1898; that said James Entwistle was ninety-

one years of age at the time of the execution of the will, and that he was then in his dotage, and his mind and memory had become so impaired as to render him wholly incapable of making a will or any just and proper distribution of his estate; that for several years prior to his death the deceased had made his home with his daughter, Elizabeth Meikle, his wife being dead; that she exercised a great influence over her father, to such an extent that she obtained from him almost his entire income; that John A. Montelius, executor of said purported will, was his confidential agent and adviser, and exercised an undue influence over him; that their joint influence was so great that the friends of the deceased applied for and obtained the appointment of a conservator of his property, and that by some means Montelius was appointed conservator; that Montelius, for the purpose of enriching himself, drafted the will, and provided that a large quantity of the real estate should be sold by the executor; that at the time of drafting the will Montelius took with him one John F. Earl, who was under his control and bidding, to attest as a witness the said will; that the will was dictated by Montelius, and that the testator did not know its contents or understand the same; that George and William Henry left minor children; that for a long time next prior to the time of making said purported will the said James Entwistle was in an enfeebled condition of body and mind, and susceptible to the undue influences then exercised by said Elizabeth Meikle and said Montelius, and was incapable of exercising any volition whatever. The bill prays that said instrument in writing and the probate thereof may be set aside and declared null and void and not the last will and testament of James Entwistle, deceased.

The answer of the defendants admits the execution and probate of the will, the death of the testator, and that his age was about ninety-one at the time of its execution; denies that the deceased was of unsound mind,

but avers he was of sound mind; denies the exercise of undue influence, but admits that shortly before his death a conservator was appointed at the solicitation of the resident children of the deceased; denies that John F. Earl was under the control of John A. Montelius, and also denies that at the time of making said will the deceased was under any constraint. A guardian *ad litem* was appointed for the minor defendants, and answer was filed by their guardian.

The question as to whether the writing produced in evidence was the last will of James Entwistle or not was submitted to a jury, who found by their verdict that he was of sound mind and memory and that the will produced in evidence was his last will and testament. A motion for a new trial was overruled and the court below entered a decree in accordance with the verdict of the jury, and further ordered that the bill of complaint be dismissed for want of equity and that complainants pay the costs of suit. From that decree the complainants have appealed to this court.

The will of James Entwistle bequeaths to his sons John, of Chatsworth, Illinois, and James, of the State of Washington, each one dollar, "they having received in my lifetime their share of property and are not entitled to any more." To Thomas he gave a life estate in eighty acres of land in Ford county, to be equally divided among his (Thomas') children, should any survive him, but should he die without children surviving, then directs that the eighty acres be sold and the proceeds be equally divided among the children of his daughter, Elizabeth Meikle, and the children of his sons George and William Henry Entwistle, share and share alike. To his daughter, Elizabeth Meikle, he gave a life estate in a quarter section of land, and at her death to be equally divided among her surviving children, and in case none survive her, then directs that the property be sold and the proceeds be equally divided among the surviving children of his sons Thomas,

George and Henry Entwistle, share and share alike. To his son George he gave a life estate in a quarter section of land in Livingston county, to be equally divided among his surviving children, and in case he should die without any surviving him, then that the property be sold and the proceeds be equally divided among the surviving children of Thomas Entwistle and William Henry Entwistle, and the children of his daughter, Elizabeth Meikle, share and share alike. To his son William Henry he gave a life estate in a quarter section of land, to be equally divided among his surviving children, but should none survive him, then he directs that the property be sold and the proceeds be equally divided among the surviving children of Thomas and George and the children of his daughter, Elizabeth Meikle, share and share alike, and lastly provides, that should any other real or personal property remain, the same be sold and the proceeds be equally divided among his children, Elizabeth Meikle and George and William Henry Entwistle. He further provided that none of his children should file any bill against his estate for board or any attention given him, as he had fully compensated them in his lifetime. He then appointed John A. Montelius, of Piper City, Illinois, as executor.

T. F. Donovan, and W. R. Hunter, for appellants.

Sample & Morrissey, and Cloud & Moffett, for appellees.

M. H. Cloud, guardian *ad litem* for minor defendants.

Mr. Justice Craig delivered the opinion of the court:

The principal question to be determined on this record is whether the evidence sustains the verdict of the jury that the testator was of sound mind and memory at the time of the execution of the will. There is no evidence in the record to sustain the charge of undue influence, and it appears to have been abandoned.

It appears that the deceased, James Entwistle, came and settled with his family on some raw land in Ford county, five or six miles from Piper City, in the year 1868. He had a family of six children. Two, John and James, were children by his first wife, and four, George, William Henry, Thomas, and his daughter, Mrs. Elizabeth Meikle, were children by his second wife. He was a man physically strong and robust, and accumulated property and left an estate worth over $40,000. In 1880 the wife of James Entwistle died, and he then went to live with his widowed daughter, Mrs. Meikle, and her children, who lived on a farm near her father. In 1891 they moved to Piper City, where he purchased a home and where he and Mrs. Meikle and her children lived until his death. The two sons George and Henry resided on the farm of James Entwistle until 1893, when they went to Chicago, but returned after about three years and farmed again a portion of the farm until their father's death. The sons John, James and Thomas never lived on the farm, Thomas residing in New York, James in a western State and John in Chatsworth, Illinois. The evidence shows that the testator transacted his own business, although he consulted, at times, with John A. Montelius, a banker, about his business matters, after removing to Piper City.

A large number of witnesses were introduced by the proponents and by the contestants, and, as is usually the case, there is a conflict in the evidence, and yet a careful reading of the testimony of the witnesses on the part of the proponents convinces us that the verdict of the jury is sustained by the evidence. The will was executed and attested May 31, 1894, and the testator died March 17, 1898. Neighbors who had lived near him for years and saw him frequently, testify that he was a man of good judgment, and intelligent, and that they noticed no difference in his mental condition during the years 1893, 1894 and 1895, and even up to 1896. The subscribing witnesses to the will both testified. John F. Earl says his

mental condition was good.  Rohrback, the other sub-
scribing witness, says that in 1892, 1893 and 1894 his phys-
ical condition was good.  He said: "I think his mind was
sufficiently clear to know how many farms and children
he had, and could express a desire that certain children
should have certain farms.  It is my judgment he had
that quantity and quality of mental capacity."  The fol-
lowing witnesses also testified for the proponents:

James McBride, a retired farmer, and who owned a
store in Piper City for about eighteen months from 1893
and sold out in 1895, said that James Entwistle came
there frequently to buy things for himself; that he was a
pretty close dealer; that he bought with good judgment
and looked at things very carefully; that his dealings in
the store continued on and off while he was in business;
that in the evenings he would get into his buggy and
they would ride around; that he talked about lands and
the price of crops and rents, etc.; that his physical con-
dition seemed right hardy and robust; that he seemed to
be intelligent and all right; that he did not see anything
wrong with him; *that his mental condition was good; that he
seemed to be intelligent, and understood what he was talking
about as much as any one.*

John R. Lewis testified that he had been county sur-
veyor for several years and justice of the peace in the
village of Piper City; that he knew James Entwistle from
1882 or 1883, while he was on his farm; that he used to
walk around town and dropped into his office nearly
every day during pleasant weather and talked with him;
that he was quite intimate about business generally, and
trade, purchase of lands and values; that he was always
pretty accurate in his opinions and in his judgment; that
he first came to his office along in 1893 and in 1894, and
came quite frequently about 1895 and 1896; that witness
had business dealings with him in 1895; that he pur-
chased a block of land belonging to Mr. Cross inside the
village of Piper City; that they talked probably a month

before the trade was made; that no one came with him; that the deed was made to him of the date of July 8, 1895; that he saw nothing wrong or strange about him.

Charles A. Cook, a neighbor of Entwistle's, testified: "I live four miles and a half from Piper City; own the farm I live on; it is right across from Entwistle's farm; I became acquainted with him in 1871; neighbored with him as farmers do; he was sick in 1892; after that I done business with him in 1893,—rented a farm of him,—and I couldn't see but what he was as rational as he ever was; he was of medium size and medium robust, energetic and done a good deal of walking; think he carried a cane a long time; always would have a stick in his hand, and when he saw a weed would knock it to pieces or pull it up; leases were made, first one in 1893 and next one in 1894; * * * he always knew when the rent was due; his mental condition at the time these leases were made seemed to be perfectly well balanced, so far as I could see, in regard to making the deal, from 1892 to 1895; after his sickness in 1892, 1893 and 1894, in the business I had with him he always did it in a rational way, and in my talks with him *I didn't see any difference from what he had always been;* of course he was getting a little older and perhaps a little more feeble; as to making contracts and business of that kind, I don't know that there was any difference manifested in him from his younger days; I remember the distress proceedings against his tenant in 1894; there was a sale; I think he bought in everything that was sold; *did all the bidding himself;* that was in the early winter of 1894." This testimony of business transactions by the testator during the very year (1894) when the will was executed is clear and positive as to his condition of mind.

Abner McLaughlin testified: "I have lived in Ford county since 1862, and close to Piper City; knew James Entwistle intimately for twenty years; saw him sometimes every day; sometimes not perhaps for a week; had frequent conversations with him; we were friendly and

our talk was usually about business of his or purchases; he seemed to be a man who was looking after money; taking his age into consideration I thought he had a fine physical condition; he frequently asked me in regard to mortgages—if I knew any he could buy or put money out on land; I met him frequently up to 1896 and talked with him; we talked about his Cross property; he asked me my opinion whether he had better invest; his mental condition was the same during the years 1893, 1894 and 1895; I didn't notice any difference as to his mental capacity; *it seemed to be good up to that time;* I didn't notice any perceptible change; he once asked me if I had made a will, and I told him no, I was not in a hurry; I think this was in 1892; am not positive."

August Opperman testified he had lived in Piper City a little over five years; that he was a farmer; that he went into mercantile business with McBride and Clark; that he knew James Entwistle in 1893, 1894 and 1895, and during those years did not notice any difference in his mental condition; that his mental condition was good.

Robert A. Jennings testified that he was clerk in Dunham's bank; that the bank had some business with James Entwistle in about 1894; that Dunham loaned him some money on his personal note; that Entwistle was alone when the note was paid; that it ran sixty days; that he seemed to clearly understand what he wanted to do; that frequently he had talks with him in 1893, 1894 and 1895; that his mind seemed to be clear.

H. Leniger testified as follows: "I have lived in Piper City since 1874; my farm is about three miles from Entwistle's; had no particular acquaintance with him until he moved to Piper City; had several conversations with him prior to 1896; from my talks with him and observation of him from 1893 up to 1896 his mental condition was good; I thought he understood everything we talked about; I observed no weakness of mind or intellect."

James Sheldon testified as follows: "I have lived on a farm about three miles from Piper City; am seventy-four years of age; knew James Entwistle in his lifetime; our dwellings were about two miles apart; he came there about 1868; we became quite friendly in 1870; I borrowed money of him and bought grain of him, etc.; I sold him the last piece of land,—335½ acres,—when he was living with his daughter in Piper City; I made the contract with him; he was a close, snug trader and very particular about making a bargain; was a man set in his ways but a fair man to deal with; down to 1895 his mental condition I wouldn't question; he was getting deaf some."

John McKinney testified that he lived in Piper City and was engaged in the hardware business; that he knew James Entwistle since 1865, mostly through business intercourse; that he had business dealings with him in 1890, 1891, 1892, 1893 and 1894; that he was a very fair man; that the only difference between him and ordinary men was, that he was a little closer than men generally are. He was asked, "Now, you may state, Mr. McKinney, what was his mental condition, say in 1892, 1893, and 1894?" and answered: "I considered it good. Down to November, 1894, I did not notice any difference in his mental condition from the years before that I had known him."

T. J. Sauers testified: "I live in Paxton at present; before that I lived four miles north-east of Piper City; knew James Entwistle, deceased, from twelve to fourteen years; he lived about five miles from me; I have been town clerk, supervisor and assessor, and justice of the peace; am now county treasurer of Ford county; knew Mr. James Entwistle, deceased, probably from twelve to fourteen years; when he moved to Piper City I met him frequently and talked with him occasionally; considered him a stout man for his age; from my acquaintance with him and observation of him I would say that his mental condition during the years 1893, 1894 and 1895 was good." He was then asked, "You may state whether or not you

observed any trouble or weakness of his mind," and answered: "I did not; I think his mind was as clear as mine."

William Dick testified: "I lived near him in Piper City; sold him two lots, and had a second deal with him in 1892; was his nearest neighbor; knew of his sickness in 1892; was sick a couple of weeks, maybe longer; I met him after his sickness; I think he was not quite so strong physically as before, but mentally he was bright as ever up to 1895."

Frank Halloran testified that his mental condition was good for a man of his age, and Philip T. Murphy, who saw Entwistle nearly every day and talked with him, says that up to 1896 he should say his mental condition was good for a man of his age; that he did not notice any failure or weakness of mind and saw nothing wrong with his mind. Dr. James Mahan, who had heard the testimony on the part of proponents and testified as an expert, testified that in his opinion James Entwistle was of sound mind.

These witnesses, seventeen in all, on the part of proponents, were in the majority of cases intimate acquaintances and business men who had transacted business with the testator from 1892 up to and including the years 1893, 1894, 1895 and 1896, and they all say his mental condition was good, and that he understood what he was doing and transacted business intelligently.

The contestants called fifteen witnesses, only a few of whom testify to having had business dealings with the testator during this period from 1892 to 1896. The first witness for the contestants was Dr. Culbertson, who attended Entwistle in February or March, 1892, when he was sick with *la grippe*. He says that after his sickness, in 1892, his mental condition was feeble, scattered and unsound; that his mind and memory were not in that condition that he was capable of understanding the ordinary affairs of life; that he was confined to his bed about two weeks; that witness has no recollection of his coming to

his office until in August, about five months afterwards; that after a person of ordinary physique passes the age of ninety there is a general breaking down of the system from senile infirmities and debility. Dr. Seawright, a physician, testified that he had practiced ten years at Chatsworth; that he treated a member of Mr. Entwistle's family in 1890 and talked with him some; that he never seemed inclined to talk on any subject; that his mental condition was bad. Joseph Graham testified that he rented land of Entwistle in 1892 and 1893 and paid the rent to Montelius by direction of Entwistle; that he asked him for the rent a second time, and when witness told him he had Montelius' receipt for it, he said, "Oh, yes; you have;" that witness heard he was sick in 1892 and saw him that summer; that he appeared very feeble; that his memory did not appear to be what it had been previous; that the contract for the land was made the first part of 1892. A. C. Miller testified that he kept a hotel and restaurant and saw Entwistle in his place of business in the fall of 1892; that he would sometimes take a chair on the hotel porch and sit sometimes ten minutes and sometimes an hour; that several times he went to sleep; that he considered him very bright for his age. Joseph Lynn testified that he knew him from 1864 or 1865, and thought from what he had seen and knew of him after his sickness that his mental capacity was not near as good as it was before; that he thought he was failing some in his mind as well as in body. Joseph Burger is to the same effect. Michael Cross expressed no opinion. E. H. Bangs testified that his age was sixty-two; that he resided in Chatsworth; that he noticed a change in Entwistle's mental and physical condition after 1880 and 1881,—the time his wife died; that he was feeble after he moved to Piper City; that old age was telling on him more and his mental condition was not as strong as it had been. L. D. Bishop testified that he saw Entwistle occasionally, and that after his sickness, in 1892, there seemed to be a breaking

down, and he went down and down until he died. Robert
Wells testified that he lived in Piper City and saw Ent-
wistle on the streets; that he did not seem inclined to
enter into conversation; that his mind seemed a little
cloudy; that that was about 1894 or 1895; that he seemed
a little forgetful, but that that was common among old
men. C. L. Melvin testified that he lived near Piper City
and was distantly related to Entwistle, the deceased;
that he saw him once in 1892 or 1893; that he was visit-
ing in Hanna City with Mrs. Meikle, his daughter; that
he was pretty well gone down; that his conversation was
not rational. J. H. Lynn testified that Entwistle would
not recognize him; that after his sickness he considered
him all broke down.

In *Meeker* v. *Meeker*, 75 Ill. 260, this court said with
reference to the rule governing testamentary capacity
(p. 266): "It is a rule of law that a person who is capable
of transacting ordinary business is also capable of mak-
ing a valid will. It is not required that he shall possess
a higher capacity for that than for the transaction of the
ordinary affairs of business. A man capable of buying
and selling property, settling accounts, collecting and
paying out money, or borrowing or loaning money, must
usually be regarded as capable of making a valid disposi-
tion of his property by will. The rule is the same in the
case of a sale of property and its disposition by will, and
the usual test is that the party be capable of acting ra-
tionally in the ordinary affairs of life. The derangement
or imbecility, to incapacitate the person from making a
valid will, must be of that character which renders him
incapable of understanding the effect and consequences
of his acts. It need not be that total derangement or
obliteration of the mental faculties which prevents the
party from reasoning correctly on all subjects, nor yet
at all times the power, upon correct premises, to arrive
at correct conclusions, but it is that want of capacity
which prevents a person from reasoning correctly, and

from understanding the relation of cause and effect in ordinary business affairs. (*Lilly* v. *Waggoner*, 27 Ill. 395; *Myatt* v. *Walker*, 44 id. 485.) And it is a question for the determination of the jury whether the party was possessed of a disposing mind."

The rule thus laid down in *Meeker* v. *Meeker, supra,* was approved by this court in *Brown* v. *Riggin,* 94 Ill. 560, *Campbell* v. *Campbell,* 130 id. 466, and *Greene* v. *Greene,* 145 id. 264. Testing the case by this rule, and by the evidence of the proponents as found in the record, we are firmly impressed that the verdict of the jury finding that James Entwistle was of sound mind and memory, and that the will produced in evidence was his will, is sustained by the preponderance of the evidence. We have given brief extracts from the testimony of the witnesses for proponents and contestants, and it shows that he was a man of robust constitution and of a strong and vigorous mind. He bought property, in one instance 335 acres of land, after he removed to Piper City. He made leases of his farms and bought lots in the village he resided in. This will was executed in May, 1894, and he attended to his ordinary business both before and for more than a year after its execution. We are impressed, after a careful examination of the record, that the weight of the evidence is in favor of proponents, and fully sustains the verdict of the jury.

The proponents' witnesses give their opinion that the testator's mental condition was good, and that he was able to and did transact ordinary business. Some of the contestants think his mind was weakened after his sickness, in 1892. In cases of this character, this court held in *Calvert* v. *Carpenter,* 96 Ill. 63, that the verdict of a jury in a case contesting a will in chancery, under the statute, "is to have the same force and effect as is given to a verdict in a case at law under a like state of facts; and where, in such case, the verdict is not manifestly against the weight of evidence, the court is bound by it in the

same manner and to the same extent as if it were a case at law. This construction of the statute is so well settled that it can no longer be regarded as an open question.—*Brownfield* v. *Brownfield*, 43 Ill. 147; *Meeker* v. *Meeker*, 75 id. 260." Under the rule established by these cases, where the testimony is conflicting and is not clearly against the evidence the verdict of the jury must be held to be conclusive. *Calvert* v. *Carpenter*, 96 Ill. 63; *Buchanan* v. *McLennan*, 105 id. 56; *Greene* v. *Greene*, 145 id. 264.

"There is another rule upon this subject," as we said in *Smith* v. *Henline*, 174 Ill. 184, "well settled by the decisions of this court, and that rule is, that where there is an irreconcilable conflict in the testimony touching the facts upon which the validity of the will depends, the decree of the lower court will not be reversed if the evidence of the successful party, when considered alone, is clearly sufficient to sustain the verdict,"—citing *Calvert* v. *Carpenter*, *supra; Moyer* v. *Swygart*, 125 Ill. 262; *Bevelot* v. *Lestrade*, 153 id. 625; *Harp* v. *Parr*, 168 id. 459. The evidence of proponents, when considered alone, is sufficient to sustain the verdict of the jury. The facts in evidence show the testator manifested sufficient capacity to transact his ordinary business at the time of making the will, in 1894, and continued to transact his ordinary business during the year 1895, and under the law as held by this court he was competent to make a valid will.

What we said in *Buchanan* v. *McLennan*, 105 Ill. 56, is applicable in this case (p. 59): "The jury had before them and saw the witnesses. They had every and superior means to ours to weigh, compare and properly estimate the value of the evidence. They could judge, by the intelligence and demeanor, as to the proper weight to be given to the testimony of all the witnesses. Of these means we are deprived. The judge who tried the case was satisfied with and acted upon the verdict. Had it not been satisfactory to him, the plain requirement of duty would have compelled him to set it aside, but fail-

ing to do so, we must presume he was satisfied with the finding."

It is urged by counsel for contestants that some of his children have been excluded from participation in his estate. Under the second clause of his will the testator devised to his sons John, of Chatsworth, Illinois, and James, of the State of Washington, the sum of one dollar each, and he gave as a reason, "they having received in my lifetime their share of property and are not entitled to any more." Assuming this to be true, he undoubtedly regarded it as just and equitable towards his other children to make the provision he did. He had a right to make such a disposition of his property, equitably or in equal proportions, among his heirs, or among others. If he had sufficient testamentary capacity he could dispose of his property in any way not forbidden by law or public policy. *Freeman* v. *Easly*, 117 Ill. 317.

Several errors are relied upon as to rulings of the trial court. We shall notice those which we deem material.

It is contended the court erred in permitting the certificate of the oath of the witnesses at the time of the probate of the will to be read in evidence by proponents. This was admissible as evidence under section 7 of chapter 148 of the Revised Statutes, as was held by this court in *Slingloff* v. *Bruner*, 174 Ill. 561.

The attesting witnesses to the will were competent witnesses on the trial, and there was no error in permitting them to testify. *Harp* v. *Parr*, 168 Ill. 459.

Error is alleged as to the cross-examination of proponents' witness Cook. An examination of the original and the additional abstracts filed by proponents shows that the direct examination of the witness was confined to transactions during the years 1892, 1893, 1894 and 1895, the will having been executed May 31, 1894. After a long cross-examination, covering the period inquired of, by the proponents, the contestants attempted to extend the cross-examination as to his mental condition up to the

testator's death, in March, 1898. That was not proper cross-examination. If the subject matter they desired to inquire about had been competent they might have called Cook as their own witness. This was not done.

Objection is made to the ruling of the court in permitting Dr. Mahan, against objection of contestants, to testify that handwriting was a test known to the medical profession in cases of sanity and insanity. Dr. Mahan, the record shows, was called as an expert, and there was no error in asking him if there was anything so known in the medical profession as testing a man's mind by his handwriting. He did not testify, neither was he asked, in his direct examination whether he could tell from the testator's signature if he was sane or insane. He was asked in his cross-examination by contestants this question, and replied, "No, sir; I could not tell whether he was sane or insane." This testimony could have worked no injury to contestants. Besides, Dr. Culbertson, contestants' own witness, testified: "I never made any study of ascertaining sanity or insanity from an isolated signature. I only know it is one of the tests of senility. The signature would be more or less affected by his physical as well as mental condition."

The appellants offered in evidence the record of the county court of Ford county to show that in 1896 or 1897, —two or three years after the execution of the will,—a conservator was appointed over the estate of James Entwistle. The court excluded the evidence, and this ruling is relied upon as error. The fact that a conservator was appointed some two or three years after the will was executed would not establish the fact that the testator did not have sufficient mental capacity to make a will. The question in issue on the trial was as to the testamentary capacity of the testator on May 31, 1894,—not whether, under chapter 86 of the Revised Statutes, there should be appointed a conservator to take charge of his property to prevent him from dissipating or wasting his

estate, and the determination of the latter question would not settle the former. Conceding that the appointment of a conservator was proper, it does not follow that the testator did not possess testamentary capacity to make a will. It may be that the record of the county court had a remote bearing on the question, but it was so remote that it was not error to exclude it from the consideration of the jury. See *Pittard* v. *Foster*, 12 Ill. App. 132, and cases there cited.

It is next urged that there was error in certain instructions. The record shows that twenty-one instructions were given on the part of proponents and eighteen on the part of contestants. Objection is made to the first instruction for proponents because it states that "the only question submitted is whether or not the instrument offered in evidence is the will of the deceased, and in deciding the question you will *only pass upon the soundness of mind* of said Entwistle." While the bill alleges unsoundness of mind and undue influence, there was no evidence introduced showing, or even tending to show, undue influence, and it was regarded as abandoned. No instructions were asked on the part of proponents on the question of undue influence, and the court regarded it as abandoned, and counsel for contestants concede there was no direct evidence of undue influence. There was no error, under the circumstances, in limiting the question to the soundness of the mind of the testator, as in the instruction.

Objection is made to proponents' fourth instruction. It in effect tells the jury that the certificate of the oath of the subscribing witnesses to the will of James Entwistle, introduced in evidence in the case, makes *prima facie* proof of the validity of the will; that a party seeking to contest a will, after the making of such *prima facie* case, on the ground of unsound mind or insanity, takes upon himself the burden of proving such grounds relied upon, and such cause or causes must be proven by a pre-

ponderance of evidence, and the jury are to determine, from the whole evidence, whether or not the instrument offered and introduced in evidence was the will of James Entwistle. This instruction is sustained by the cases of *Craig* v. *Southard*, 162 Ill. 209, and *Egbers* v. *Egbers*, 177 id. 82, in which last case we said (p. 88): "This court has repeatedly said that the law presumes every man to be sane until the contrary is proved, and the burden of proof rests upon the party alleging insanity. (*Argo* v. *Coffin*, 142 Ill. 368; *Guild* v. *Hull*, 127 id. 523; *Menkins* v. *Lightner*, 18 id. 282.) But it is incumbent on the proponents of the will to make out a *prima facie* case in the first instance, by proper proof of the due execution of the will by the testator, and of his mental capacity, as required by the statute. The burden of proof is then upon the contestants to prove the allegations of their bill by a preponderance of all the evidence that the testator was mentally incompetent. The law throws the weight of the legal presumption in favor of sanity into the scale in favor of the proponents, from which it necessarily results that upon the whole case the burden of proof rests upon the contestants to prove the insanity of the testator,"—citing *Craig* v. *Southard*, 162 Ill. 209; *Same* v. *Same*, 148 id. 37; *Taylor* v. *Pegram*, 151 id. 106; *Wilbur* v. *Wilbur*, 129 id. 392; *Carpenter* v. *Calvert*, 83 id. 62.

The eighth instruction, at its close, is subject to criticism, but it is not of that character as would be likely to mislead a jury when considered in connection with other instructions in the case.

Other criticisms are made on the twelfth, fifteenth, sixteenth and seventeenth of proponents' instructions, but an inspection of them does not show they were erroneous, as counsel contend.

Objection is urged against the modification of contestants' eighteenth instruction. The modification was: "If, upon the whole evidence, you believe James Entwistle was not of sound mind and memory, as defined in these

instructions, then you should find that the purported will is not the will of James Entwistle, deceased." This modification was proper under the ruling in *Slingloff* v. *Bruner*, 174 Ill. 561.

Contestants allege error in the refusal of the court to give the following instruction:

"If, from all the evidence in this case, you should be in doubt as to whether James Entwistle, at the time he signed the instrument in controversy, (if you believe, from the evidence, that he did sign it,) was able to and did understand the nature and effect of the same, then you should find it is not his last will."

This instruction is contrary to the rule laid down by this court in *Myatt* v. *Walker*, 44 Ill. 485, and in *Taylor* v. *Pegram*, 151 id. 106, where we said: "Hence, it is not sufficient that the evidence raises a *mere doubt* as to sanity of the testator; the evidence must preponderate in favor of his unsoundness of mind." The instruction was properly refused.

The fourth and sixth refused instructions related to undue influence, and, there being no evidence offered on this issue, were properly refused.

The seventh refused instruction was based upon the theory that the deceased did not dispose of all his property by will. The record shows he did dispose of all his property, and, not being based upon any evidence, it was not error to refuse it.

The eighth refused instruction was properly refused, because it called attention to particular facts.

The jury were fully and fairly instructed by the court as to the law applicable to the facts on the side of contestants and proponents, and finding no sufficient error for reversing the decree of the circuit court it will be affirmed.      *Decree affirmed.*