HENRY VAN GUYSLING and CATHARINE FURMAN, Appellants, *v.* JAMES VAN KUREN and others, Respondents.

TESTAMENTARY CAPACITY. The testator should be capable of comprehending the condition of his property, and his relations to the persons who are or might have been the objects of his bounty.

HIS MEMORY. He should be able to collect in his mind, without prompting, the elements of his business to be transacted, and hold them there until their relations to each other can be perceived, and a rational judgment in respect thereto be formed.

APPEAL from a judgment of the Supreme Court in the fourth district, affirming a decree of the surrogate of the county of Schenectady, admitting to probate an instrument propounded as the will of Anna Maria Vedder, deceased.

The testatrix died the 18th July, 1861. Her estate consisted of personal property alone, valued at from $4,000 to $6,000. Her next of kin were the appellants, children of Myndert Van Guysling, deceased, a brother of the testatrix, and Ann Eliza Van Kuren, Maria Gow, Judith Curtis and Daniel Van Guysling, children of her deceased brother, Peter Van Guysling. The instrument proposed as her will is dated the 17th July, 1856. It gives the sum of one hundred dollars to Anna M. Van Kuren, a daughter of the above named Ann Eliza Van Kuren, and the residue of her estate to the said Ann Eliza Van Kuren, Maria Gow and Judith Curtis.

The appellants contested the probate of the will on the grounds: 1. That, at the time of executing it, the deceased was not of sound mind; and, 2. That it was procured by undue influence.

*Robert Furman,* for the appellants.

*John Sanders,* for the respondents.

SMITH, J. The surrogate decided that the testatrix was partially insane during the spring and summer of 1856, but that the will was executed in a lucid interval. The Supreme Court did not assent to the conclusion of the surrogate that the testatrix was partially insane prior to the making of the will, but they concurred with him in the opinion that she

was of sound and disposing mind when the will was executed. I think the conclusions of the latter court are correct. In stating the reasons for this opinion, it is unnecessary to review minutely the mass of testimony before us : it is enough to advert to the prominent features of the case.

The testatrix was about sixty-five years of age when she made the will. Her husband died on the 17th April preceding. A few days after his death she removed from the house where they had lived together, and went to reside in the family of James Van Kuren, the husband of Ann Eliza Van Kuren, one of the residuary legatees. In June following she gave Van Kuren a power of attorney to transact her business, and he managed her affairs from that time till her death. She also appointed him one of the executors of her will. The will was executed at his house, in the presence of Van Kuren and his wife. In March, 1857, by an inquisition in the Supreme Court, the testatrix was declared a lunatic from the last of October, 1856. The fact of insanity at the time found by the inquisition appears to be unquestioned, and it narrows the investigation upon this branch of the case to an inquiry whether the unsoundness of mind, which was so unmistakably exhibited in October, did not exist as early as the preceding July.

It is apparent from the testimony that the testatrix was a person of but a moderate share of intellect; she had but little education, but could read and write some; she was ignorant, and believed in the existence of witches, and what she termed " spooks ;" she was of a very excitable temperament, and was occasionally subject to furious outbreaks of anger.

The greater part of the testimony was directed to the condition of her mind during the last illness of her husband, and immediately following his death. A large number of witnesses, called by the contestants, testified that they saw her once or oftener during that period, and thought her insane. Of those witnesses, only one, Alonzo J. Chadsey, was a physician, or had any special acquaintance with mental diseases. Some of the non-professional witnesses stated the facts and circumstances on which they based their opinions that the

testatrix was insane.   Others gave their opinions barely, or, if they stated facts, they did it in general terms only; as, for instance, that "she acted strange;" "she looked wild;" "she wandered in her talk."   Of the facts specially detailed by the non-professional witnesses, some of the most marked are the following :

The testatrix, when spoken to, about the time of her husband's death, sometimes burst into tears; occasionally, immediately after crying, she laughed; sometimes, when addressed, she made no reply, and sat by herself, evidently disinclined to talk; at other times she talked disconnectedly, or repeated the same remark or inquiry several times in one interview; at times she was forgetful, inquiring after persons whom she had formerly known well, but who had been dead many years; she said that she was tormented by witches and spooks ; that they kept her awake nights; and she became enraged when told there were no witches; on one occasion she directed one of the witnesses to buy two pounds of pork, and gave him two cents to buy it with, when the price was eight cents a pound; once she used her fingers instead of a knife and fork in conveying food to her mouth at table; and frequently, when she was excited, her eyes appeared wild and glaring.   Many other circumstances were detailed, of less importance.

Three physicians were called by the contestants, and they expressed the opinion that the testatrix was insane.   Of these, one testified that he was called to attend her for a fractured leg in 1836, and that he then thought she had a disease of the brain which affected her mind and whole nervous system, and which he then thought would result in insanity, the symptoms of which were, that she imagined she saw things that did not exist, and had pains and diseases which the witness could not detect; her sleep was troubled, and she described visions which she said she saw in her sleep; that he saw her occasionally till 1843, and the same general symptoms continued; and that he did not see her again till the spring of 1856, when he conversed with her but little, but judged she was insane from a contraction of the pupil of

the eye, and a fixedness in her look that he had not discovered before so apparent. · It does not appear that the witness ever communicated to any one his opinion, formed in 1836, that Mrs. Vedder would inevitably become insane.   Of the other two physicians, one never saw her, so far as appears, till the spring of 1857; and the other testified that the only time he ever saw her was in 1851; that he could not relate anything she said; that he called, not to visit her, but on business with her husband; and that he did not recollect whether he did the business, or saw any person but Mr. Vedder, or what time of day it was; whether before or after noon, or what season of the year.

The testimony of these medical witnesses throws very little light upon the question as to the condition of Mrs. Vedder's mind in 1856, and really adds nothing to the strength of the contestant's case.

On the other hand, the proponents introduced evidence tending to show that, during her husband's illness of eighteen months' duration, Mrs. Vedder took care of him, with the assistance of a female servant part of the time; that she was a tidy housekeeper; that many of her old friends and neighbors frequently called on her, and conversed with her, and did not discover any evidence of insanity; that after her husband's death, she dressed herself, knit, sewed, ate at the table habitually with the family; on one occasion, when a person whose note she held called to pay the interest, she produced the note, took the money, looked it over, and said it was right, as it was in fact; at another time, she was called on by the treasurer of a church in Schenectady to lend money on security, and she replied that she had none on hand at the time, that she had some out on interest and thought it had better remain; at another time, a child fourteen months old was left in her charge by its mother, and she took care of it several hours; she requested a copy of her husband's will to be made for her at the surrogate's office, and when it was brought to her, she asked to have it read, and made inquiries about the effect of its provisions; she requested a counselor-at-law to be called to draw a power of attorney

to Van Kuren, and when he came, gave him instructions respecting it, which were followed in drawing it. The testimony of the subscribing witnesses to her will shows very satisfactorily that at the time of its execution she understood its provisions and talked rationally about them; and it appears that the disposition of her property was in accordance with her intention, then expressed and repeatedly declared on other and previous occasions.

Upon the whole evidence, there is hardly room to doubt that, in July, 1856, her intellect had not yielded to the malady which overcame it in October, and that, at the time of executing her will, she was of disposing mind and memory, within the rule suggested in the case of *Delafield* v. *Parish* (25 N. Y., 9). "We have held," said Judge DAVIES, in the leading opinion in that case, "that it is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were, or should, or might have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must, in the language of the cases, have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive, at least, their obvious relations to each other, and be able to form some rational judgment in relation to them. A testator who has sufficient mental power to do these things, is, within the meaning and intent of the statute of wills, a person of sound mind and memory, and is competent to dispose of his estate by will."

In respect to the allegation of undue influence, the testimony falls so far short of sustaining it, that it is unnecessary to consider that branch of the case.

A point was made on the argument that the surrogate erred in excluding evidence of the declarations of Mr. Van Kuren, but it has no merit. The declarations were mere hearsay.

The judgment of the Supreme Court should be affirmed.

DAVIES, Ch. J., WRIGHT, PORTER, HUNT and LEONARD, JJ., concurred; MORGAN, J., thinks it a case for an issue; PECKHAM, J., not voting. Judgment affirmed.