# COFFEY'S
# PROBATE DECISIONS.

ESTATE OF THOMAS W. MAHONEY, DECEASED.

[April 15, 1902.]

**Will—Testamentary Capacity—Intemperance and Improvidence.—**A man may be greatly given to the use and abuse of liquor and yet be competent to make a will. He may be incompetent to manage an estate by reason of intemperance and improvidence and yet retain sufficient capacity for testamentary disposition.

**Will — Testamentary Capacity — Dissipation and Intoxication.—**No rule of law denies to a man who is dissipated and habitually addicted to the excessive indulgence in intoxicants the right to make a will.

**Will—Testamentary Capacity.—**The Habitual Use of Intoxicating Liquors, long continued and indulged in to excess, even though resulting in temporary fits of insanity or delirium tremens, does not alone raise a presumption of testamentary incapacity, if it appears that the testator was sufficiently sober when executing the will to know what he was doing, and that he was not unduly influenced. Nor need he be shown to have been wholly sober at the instant of the execution of the will if it is proved that he was sufficiently so to understand the character and effect of his act, the extent of his property and the nature of the claims of his kin, and be able to act of his own will.

**Will—Intoxication of Testator.—**In Order to Vitiate the Act, the testator, at the time of executing the paper, must have been under the influence of intoxicating liquors and to such an extent as to disorder his faculties and prevent his judgment.

**Will—Undue Influence.—**The Fact of Drunkenness when the will was executed is relevant upon the question of undue influence.

**Will—Testamentary Capacity—Lucid Intervals.—**In Cases of Temporary Delirium, arising from the excessive use of stimulants, where no question of fixed and mental unsoundness is involved, the doctrine of lucid intervals does not apply.

**Will—Intoxication of Testator—Burden of Proof.—**Though the testator may have, when under the influence of liquor, acted like a maniac, still, if when subsequently sober he acted rationally and sanely, the burden is on the party asserting his testamentary in-

capacity, to show that he was incapable at the date of the execution of the will. The rule is the same where it conclusively appears that on one or more occasions prior to the time of execution, the testator had had attacks of dipsomania.

**Insanity.—The Habitual and Excessive Use of Intoxicating Liquors** as a beverage may result in permanent insanity. By permanent insanity is meant in this connection not merely dipsomania, but a condition of fixed and continued mental unsoundness.

**Insanity — Presumption from Habitual Intoxication.—** Permanent insanity cannot be presumed from proof of habitual drunkenness, however excessive or long continued.

**Will — Testamentary Capacity — Person Under Guardianship.—The** fact that the testator, at the time of the execution of the will, is in charge of a guardian as an habitual drunkard, while relevant as some evidence of incapacity, is never conclusive that a will is invalid.

**Insanity.—Proof of Habitual Drunkenness is Relevant** upon the issue of insanity, its weight depending upon all the circumstances of the case.

**Insanity.—Whether Long-continued Inebriety has or has not Impaired** the mind and destroyed a sound and disposing memory is a question of fact which will depend upon all the circumstances, including the physical and mental condition of the testator, his age and sex, his previous life and habits and present surroundings.

**Insanity.—In Determining Whether Habitual Drunkenness has or** has not resulted in permanent insanity, or delusions assimilating to that condition, the evidence must not be confined to the personal habits of the testator, but the surrounding circumstances and his bodily condition must also be considered.

**Will—Intoxication.—No Presumption That a Man was so Drunk** when he made a will that he was incapable of making it properly arises from proof that he had been drunk at a prior period or that he was an habitual drunkard.

**Will.—The Intoxication of the Testator, if It is Proved** to exist at the date of the execution of the will, must, in order to invalidate it, have been of such a character as to have deprived him of judgment while executing it.

**Will.—In Order That the Will of a Drunkard may be Invalidated** because of his habits of intoxication, it must appear affirmatively, either that his mind was totally destroyed thereby or that he was so far under the influence of intoxicants at the instant of its execution that he was incapable of comprehending the nature, extent and disposition of his estate and his relations to those who have a claim upon his bounty.

**Will—Habitual Drunkard—Judicial Determination.—The** burden of proof is upon the contestant, even where it conclusively appears that

the testator has been judicially pronounced an habitual drunkard, to show that he was in such a condition from intoxicants at the time of execution as not to have testamentary incapacity.

Will.—In Testifying to the Intoxication of the Testator, a witness is merely stating his opinion as to his condition, and any person who knows the testator, though he be not an expert, may testify to the fact that he was intoxicated upon a stated occasion, for the subject is one upon which any intelligent person is competent to form an opinion.

Will—Intoxication of Testator.—A Witness will not be Allowed to State that, in his opinion, the testator was so drunk at the date of execution as not to be capable of making a valid will, or to give his opinion that he was unduly influenced in the making of his will by reason of intoxication.

Will.—A Witness may Testify That, in His Opinion, the Testator was an habitual drunkard, though his habitual drunkenness has never been judicially determined.

Will.—Where the Testator is Alleged to have Been Drunk at the time he executed the will, it is admissible to prove his conduct upon previous occasions when he was under the influence of drink, to illustrate his usual manner of acting when intoxicated.

Will.—The Fact That the Testator was an Habitual Drunkard may be proved by the evidence of his commitment as such, with proof that he has not adopted reformed habits of living.

Will—Intoxication of Testator.—It may be Shown That the Testator had an opportunity to procure liquor or that he had it in his possession, but his intoxication at any particular point of time cannot be inferred from the fact that at that time he had intoxicating liquors in his possesssion.

Will—Intoxication of Testator.—Where It Appears That the Testator had been drinking a short time before the execution of the will, evidence may be received to show how long it usually takes for a person to get sober. The period of time required for a person to become sober depends primarily on the person, and secondly on the quantity and nature of the intoxicants consumed.

Will—Epilepsy.—No One Possesses Testamentary Capacity during the actual paroxyms of an epileptic seizure, and the importance of proof that the deceased was subject to epileptic fits depends wholly on the proximity of the fit to the time of the execution of the will. The fact that the testator has had an epileptic seizure raises no presumption of continuing incapacity, and proof of epilepsy does not cast the burden of proving a lucid interval upon the proponent.

Administrator.—No Person is Eligible or Entitled to Serve as administrator who is incompetent to execute the duties of the trust by

reason of drunkenness, improvidence or want of understanding or lack of integrity, and it must be presumed that the appointing power discharged its duties and appointed a sane, sober, provident and honest man to execute the trust of administrator.

Evidence.—A Judge is not at Liberty Judicially to Poise His Personal impression against the solemn statement under oath of two reputable witnesses to the factum.

Will.—A Testator has No Legal Burden Imposed upon Him to Provide for His Uncle, and a failure so to provide is neither unnatural nor necessarily undutiful, especially where the person unprovided for is unknown or thousands of miles distant, and where no communication or correspondence passed between such collateral relative and the testator.

Will—Undue Influence.—The Mere Existence of Confidential Relations between the testator and the principal beneficiary under his will, who is also the proponent, does not raise the presumption that the will was procured by the exercise of undue influence nor impose on the proponent the burden of disproving undue influence, fraud or coercion; there must be, in addition to that fact, evidence of his active interference in procuring the execution of the will before that presumption arises.

Will.—If a Presumption is to be Indulged, It is Rather in favor of a will when the testator leaves property to one with whom he had intimate and confidential relations during his life, as it is usually designed to give property to those whom the testator desires to favor.

Will.—The Declarations of a Testator in Support of His Will are admissible to establish freedom of volition and exemption from undue influence and to maintain the testamentary instrument as having been made in consonance with the wishes of the testator.

Will—Undue Influence.—A Person cannot be Called upon to Prove that a transaction with which he had nothing to do, was a fair one; hence no presumption of undue influence can arise as to such person.

Evidence.—Neither the Verdict of a Jury nor the Decision of a Court can rest on surmise, suspicion or conjecture, howsoever strong.

Theodore J. Savage and Martin C. Hassett, for contestant.

John M. Burnett and Matt I. Sullivan, for proponent and respondent.

COFFEY, J.   This is a contest on an application for probate of an alleged will on the grounds of unsoundness of mind, fraud and undue influence.  The paper propounded is in words and figures as follows:

"In the name of God Amen.

"I Thomas W. Mahoney unmarried and being of sound and disposing mind and memory, and not acting under duress, menace, fraud or undue influence of any person whatsoever do make, and publish and declare this my last will and testament in the manner following that is to say,

"1.

"I direct that my body be decently buried with proper regard to my situation and condition in life and the circumstances of my estate.

"2.

"I direct that my executor hereinafter named as soon as he has sufficient funds in his hands pay all just debts, and funeral expenses and the expenses of my last sickness.

"3.

"I give and bequeathe to Frank Conklin of the City and County of San Francisco all of my estate, real, personal or mixed, of which I may die seised or in which I may have any interest at the time of my death. To have and to hold the same to him and his executors, administrators, and assigns for ever.

"4.

"I hereby nominate and appoint Frank Conklin of the City and County of San Francisco executor of this my last will and testament without bonds.

"December 4th, 1900.

THOMAS WM. MAHONEY.

"M. C. HOGAN,
"S. D. CHIUCOVICH,
    "Witness."

It is unnecessary to state in detail the evidence in this contest or to recapitulate the points on either side. The testator was addicted to drink from an early period of his life to the time of his death, at the age of less than forty years. After his father's death there was an appreciable abatement in his appetite, but prior to that event he was a steady tippler, if not a regular toper; but a man may be greatly given to the use and abuse of liquor and yet be competent to make a will.

He may be incompetent to manage an estate by reason of intemperance or improvidence, and yet retain sufficient capacity for testamentary disposition. No rule of law denies to a man who is dissipated and habitually addicted to excessive indulgence in intoxicants the right to make a will. Underhill, in his recent and valuable treatise on the Law of Wills, deduces as the result of the authorities on this point that the habitual use of intoxicating liquors, long continued and indulged in to excess, even though resulting in temporary fits of insanity or delirium tremens, does not alone raise a presumption of testamentary incapacity, if it appears that the deceased was sufficiently sober when executing the will to know what he was doing, and that he was not unduly influenced. Nor need he be shown to have been wholly sober at the instant of the execution of the will, if it is proved that he was sufficiently so to understand the character and effect of his act, the extent of his property and the nature of the claims of his kin, and to be able to act of his own will.

"In order to vitiate the act, the testator, at the time of executing the paper, must have been under the influence of intoxicating liquors, and to such an extent as to disorder his faculties and prevent his judgment."

But the fact of drunkenness when the will was executed is always relevant upon the question of undue influence. For a man whose mental and physical powers are weakened and confused by alcoholic intoxicants cannot, while he is under this influence, exert his will in its full vigor or manfully resist the importunity of those about him.

The characteristics of temporary insanity which is the result of an over-indulgence in alcoholic stimulants are clearly distinguishable by the most superficial observer from symptoms which attend other forms of mental unsoundness. In delirium tremens the periods of insanity are of limited duration, and these are succeeded by intervals of calm, during which the patient, though perhaps physically exhausted, is mentally himself again. As the sufferer proceeds along the road to his ultimate recovery, the paroxysms are less severe and of shorter duration, and the intervals between them grow longer and more frequent. If the course of the disease is

favorable, the gradually diminishing paroxysms at length cease altogether, and the patient, provided his physical system has been fortified by proper methods to withstand the strain put upon it, finds himself fully restored to reason. The insidious poison contained in the alcohol, which has produced in his excited brain the delusions which have tortured his waking hours and made his sleep a thing of horror, having been eliminated from his system, the delusions themselves have totally disappeared. Such a state of delirium as has been described is wholly temporary, for the reason that the cause which produced it is temporary; and the cause being removed, the effect will also disappear. Here there is no question of a lucid interval. The man is restored to his former health and his reason is again firmly seated on her throne. True it is, that if he shall repeat his former error the result may be the same or perhaps worse. But that would be a new delirium, not a continuation of the former one. For, while he is sober he is sane and possesses testamentary capacity.

In cases of temporary delirium, arising from the excessive use of stimulants, and where no question of fixed mental unsoundness is involved, the doctrine of lucid intervals does not apply. Though the testator may have, when under the influence of liquor, acted like a maniac, still, if when subsequently sober he acted rationally and sanely, the burden is on the party asserting his testamentary incapacity to show that he was incapable at the date of the execution of the will. The rule is the same where it conclusively appears that on one or more occasions prior to the time of execution the testator had had attacks of dipsomania.

The habitual and excessive use of intoxicating liquors as a beverage, continued for some time, may, according to the best medical authorities, result in permanent insanity. By permanent insanity is meant, in this connection, not merely dipsomania, but a condition of fixed and continued mental unsoundness. Permanent insanity, however, cannot be presumed from proof of habitual drunkenness, however excessive or long continued. And the fact that the testator at the time of the execution of the will is in charge of a guardian as an

habitual drunkard, while relevant as some evidence of incapacity, is never conclusive that a will is invalid. But proof of habitual drunkenness is always relevant upon the issue of insanity, its weight depending upon all the circumstances of the case. Whether long-continued inebriety has or has not impaired the mind and destroyed a sound and disposing memory is always a question of fact, which will depend upon all the circumstances, including the physical and mental condition of the testator, his age and sex, and his previous life and present surroundings. All these facts must be considered in connection with the habit of the testator.

It is well known that the effect of the indulgence in intoxicating drink varies according to the circumstances and bodily condition of the person. Some can drink large quantities of liquor without any apparent diminution of their physical or mental powers, either because they are of exceptional physical strength or vigor, or because their avocations minimize the intoxicating and debilitating effect of what they drink. Others succumb to the most ordinary indulgence. The imbibition of a quantity of liquor which in one case would produce little, if any, effect, may in the other produce a high state of mental excitement, and, if long continued, a permanent cerebral deterioration. In determining, therefore, whether habitual drunkenness has or has not resulted in permanent insanity, or delusions assimilating to that condition, the evidence must not be confined to the personal habits of the testator, but must take a wide range along the lines just pointed out.

No presumption that a man was so drunk when he made a will that he was incapable of making it properly, arises from proof that he had been drunk at a prior period, or that he was an habitual drunkard. The intoxication of the testator, if it is proved to exist at the date of the execution of the will, must have been of such a character as to have deprived him of judgment while executing it. For, in order that the will of a drunkard may be invalidated because of his habits of intoxication, it must appear affirmatively either that his mind was totally destroyed thereby, or, if this is not shown, that he was so far under the influence of intoxicants at the instant

of its execution that he was incapable of comprehending the nature, extent and disposition of his estate and his relations to those who have a claim upon his bounty. And the burden of proof is always upon the contestant, even where it conclusively appears that the testator has been judicially pronounced an habitual drunkard, to show that he was in such a condition from intoxicants at the time of execution as not to have testamentary capacity.

Any witness who knows the testator may, though he is not an expert, testifying that he was intoxicated upon a certain date. In testifying to the intoxication of the testator, the witness is merely stating his opinion as to his condition; but his evidence is not, for this reason, to be rejected, as the subject is one upon which any intelligent person is competent to form an opinion. The proof of intoxication is most valuable when it refers solely to the time of the execution of the will. The object of the evidence of intoxication is to show that his mental capacity was so far weakened or destroyed by drink that at the date of execution he did not possess testamentary capacity, or that his mind was then under an undue and improper influence. But evidence of intoxication on other dates is not irrelevant, particularly if it appears that the testator was addicted to the habitual use of intoxicants.

Where the testator is alleged to have been drunk at the time he executed the will, it is admissible to prove his conduct upon previous occasions, when he was under the influence of drink, to illustrate his usual manner of acting when intoxicated. A witness will not be allowed to state that in his opinion the testator was so drunk at the date of execution as not to be capable of making a valid will, or to give his opinion that he was unduly influenced in the making of his will by reason of intoxication. These are questions for the jury. The fact that the testator is an habitual drunkard may be proved by the evidence of his commitment as such, with proof that he has not adopted reformed habits of living. A witness may testify that in his opinion the testator was an habitual drunkard, though his habitual drunkenness has never been judicially determined. This is the rule in criminal cases, and

is believed to be equally applicable where the issue of intoxication arises in the probate of a will.

The fact that the testator had an opportunity to procure liquor, or that he had it in his possession, is relevant; but his intoxication at any particular point of time cannot be inferred from the fact that at that time he had intoxicating liquors in his possession.

Where it appears that the testator had been drinking a short time before the execution of the will, evidence may be received to show how long it usually takes for a person to get sober. The period of time required for a person to become sober depends, primarily, on the person, and, secondly, on the quantity and nature of the intoxicants consumed.

There is some evidence that testator had had attacks of falling sickness, or what is known medically as epilepsy.

The importance of proof that the deceased was subject to epileptic fits depends wholly on the proximity of the fit to the time of the execution of the will. It certainly requires no professional knowledge to affirm that no one possesses testamentary capacity during the actual paroxysm of an epileptic seizure. The mind of the patient is wholly overcome by the violence of the spasm. He has no control of his physical powers, and his signature or mark affixed to a writing while in this condition would conclusively be presumed not to be his voluntary mental act. The unconsciousness caused by the fit is usually temporary, its length depending upon the degree in which the physical constitution of the patient had succumbed to the disease. The paroxysm is usually succeeded by a period of extreme physical exhaustion and mental weakness, extending over two, or perhaps three days. The patient then usually regains his normal condition, which continues until his subsequent seizure by a similar spasm. The fact that the testator has had an epileptic seizure raises no presumption of continuing incapacity. The fact may be proved for what it is worth. And proof of epilepsy does not cast the burden of proving a lucid interval upon the proponent, for, after the convulsion with its attendant weakness has subsided, the mind is usually restored, to outward appearances at least, to its former normal condition. And it may be

shown in evidence that after his recovery the deceased continued to transact his ordinary business as usual.

It is alleged by contestants that for many years prior to his death the decedent was an inebriate, addicted to the intemperate use of alcoholic liquors, and constantly under their influence, and that by reason of those habits he became and was greatly weakened and impaired in body and mind, and his understanding became and was cloudy and his will weakened. During all of said times decedent was the administrator of the estate of his deceased father, and during all of said times he employed Frank Conklin (the proponent here, executor, and sole beneficiary), as his agent, and the said Frank Conklin was his agent, and as such agent, gained, held and retained during all of said times, the entire confidence of the said decedent. It is alleged by contestant that by reason of the inebriety of the said decedent and the agency of the said Frank Conklin, he, the said Frank Conklin, obtained, held and exercised during all of said times, a dominating influence over the mind and will of the said decedent, and during all of said times, acquired and held a real authority over him, and caused said decedent to repose a confidence in him; and that at and prior to the alleged making of said will decedent became, and for a long time prior thereto, he was absolutely subject to the wishes and will of said Frank Conklin, and childishly followed his will and directions without exercising any independent will of his own. That said Frank Conklin, at and before the execution of said proposed will, actually used the said confidence so reposed in him by said decedent as aforesaid, and actually used the said authority over the said decedent so held by him as aforesaid, for the purpose of obtaining an unfair advantage over said decedent, to wit: For the purpose of compelling him to sign the said proposed will bequeathing to him, the said Frank Conklin, all of the property of said decedent; that said Frank Conklin originated the said will, and the same was prepared by him or under his directions, and the same was the expression of his wishes and purpose, and not those of the decedent; and that the said Frank Conklin importuned, commanded and directed the said decedent to sign and execute the said will, and by reason of said undue influ-

ence so exerted as aforesaid, compelled the signing and execution of said proposed will by decedent, and exerted said undue influence upon said decedent in relation to and upon every act of executing said will, and thereby deprived the said decedent of all independent power of will in that particular, and coerced the said will and mind of said decedent and the signing and execution of said will, and that said decedent at said time could not resist said undue influence and did not resist the same; that the said decedent would not have executed the said will but for the confidence reposed by him in the said Frank Conklin, and but for the authority of said Frank Conklin, and that said will was executed by said decedent wholly and entirely by reason of said confidence in and authority of the said Frank Conklin, and the undue use thereof by the said Frank Conklin as aforesaid; and that if the said undue influence had not been exerted by said Frank Conklin upon said decedent as aforesaid, the said decedent would not have signed or executed the said will.

Contestant claims that the proponent's own witnesses prove that decedent was a constant drinker and a confirmed inebriate. Proponent concedes as the effect of the evidence that the decedent became intoxicated occasionally, but contends that such intoxication was intermittent after his father's decease, and that he was more frequently sober than inebriated after that time.

Within the temporal term, "many years," embraced in contestant's allegation, decedent was appointed and acted as administrator of his father's estate.

From January 25, 1897, to January 15, 1901, he so served. Under the statute no person is eligible or entitled to serve as administrator who is incompetent to execute the duties of the trust by reason of drunkenness, improvidence, or want of understanding, or lack of integrity.

It must be presumed that the appointing power discharged its duties and appointed a sane, sober, provident and honest man to execute the trust of administrator.

Is this presumption borne out by the evidence as to the manner in which the decedent fulfilled the functions of his office?

Decedent was appointed administrator of his father's estate January 25, 1897. His father was indebted at the time of his decease in large sums, principally to two banks secured by mortgage, interest payable monthly. This interest was paid punctually by the administrator. A very advantageous lease of the entire property on the corner of Sixth and Bryant streets for five years at $175 per month for the first three months, and $200 per month thereafter, was made in April, 1898, the negotiations initiated by decedent. In March, 1900, the City Hall lot, subject to mortgage to French Bank for $6,000, was sold and the sale confirmed; the monthly interest of about $23 thereon ceasing as to the estate; thereupon the minor obligations and bills were liquidated, and in June or July, 1900, the mortgage to the Hibernia Bank was renewed by leave of court, and decedent had an assured net income of $125 per month. In these transactions the part taken by decedent evinced sanity and sobriety.

The evidence affords no pretense for contending that decedent was intoxicated at the time of the transaction.

Thirty witnesses testified to their opinions in favor of the sanity of decedent, supporting those opinions by reasons among which were his intelligence shown in conversation, his recognition of acquaintances, addressing them by correct name; he assisted about the Conklin establishment, addressed parcels, drove wagons, delivered goods, answered telephone calls, inscribed orders in book kept for that purpose, accurately and intelligently written; he carried checks to the grand secretary of the Order of Foresters; he discussed the topics of the day with various persons; he expressed himself with clearness in favor of the new charter for San Francisco; he approved of the acquisition of the Philippine Islands and advanced valid commercial grounds to support his judgment, such as, that the material advantage of this metropolis would be enhanced thereby, and, therefore, as a property holder he would benefit; he thought, also, that if we did not seize the situation with alacrity, some other power would grasp the Oriental Archipelago and our opportunity unimproved would be a local calamity. He was not concerned with the moral

quality of the proposition; his views were solely sordid in the premises.

He was fond of playing cards and was accounted by his associates a "foxy player," quite cunning in his handling of the pasteboards and deft in his dealing; he was eager to win and keen to realize, showing in this regard the symptoms of sanity common to the votaries of games of this character. He was trusted to take large sums of gold of high denominations to the city treasury to exchange for smaller coins, and without any memoranda always returned the exact equivalent. He was prompt in observing his engagements in court and with his counsel, never missing an appointment except once, about a week prior to his decease; this was immediately before he went to the hospital, whence he never came out alive.

Decedent gave reasons for making his will, that he was unwell and that his physician had advised him to arrange his affairs; he signed and verified various papers filed in the estate proceedings; he gave sensible testimony in court. When the City Hall lot was sold he favored the sale on plausible grounds, although he thought the price too low, but the best that could be obtained at the time; he arranged with Beckman for the lease of the Sixth street property and executed it; he executed the will properly; he favored the election of Mr. Bryan to the Presidency, because as a consequence the silver mines would be reopened and developed and better times would ensue; he gave correctly to the letter-carrier the addresses of persons whose letters were sent to Conklin's place and who had changed their directions; he went to the theatre and criticised the performance; he made arrangements for boarding at the restaurant; he discoursed rationally on the administration of municipal government, advocated certain candidates because their success would result in the reduction of taxation, and in many other particulars and respects he behaved like any rational man. This is about the sum of the testimony of the witnesses for the proponent.

The evidence for contestant on the issue of unsoundness of mind does not disturb the deduction that at the time of the transaction the decedent was of sound mind. At the time of the execution of the will there is no evidence that he was men-

tally incompetent, and the testimony as to his general competency preponderates for proponent.

As to the issue of undue influence and fraud there is no direct evidence that proponent importuned, commanded or directed the decedent to sign and execute the will, but there are circumstances tending to show that the Conklins were potential in persuasion over the conduct and actions of decedent and exercised considerable sway over his daily course of life.

Contestant claims, as the effect of the evidence, that decedent was entirely under the influence of the Conklins; that he had no control of himself; that he was a mere child in their hands; that he was dependent upon them for his daily drams, and could not be trusted except with the dimes doled out to him by them; that they improperly and unduly induced and influenced him to execute a deed of his property to proponent, for which there was not a dollar of consideration, delivered on the day of his death, and that the will was concocted to bolster up the deed, and that the story of William Conklin, the brother of proponent, is a mere figment of his imagination, intrinsically improbable if not incredible, and that the inference is irresistible that the will was leisurely drawn up by William Conklin long before its date from some legal form and preserved to await an opportunity to secure the signature of decedent, or more likely that the signature of decedent was first obtained and then the scrivener wrote the testament above the name, and that the names of subscribing witnesses were appended after the death of decedent as a favor to proponent.

This is contestant's theory of the manner in which this instrument was fabricated; but Hogan and Chiucovich testify with positiveness and particularity as to the execution and the attendant circumstances. What is there to contradict their sworn statements? The contestant contends that the document itself contradicts their testimony, that the difference in the inks is an item in itself of pregnant significance, the date and the names of the witnesses being in a blue fluid on the main body of the instrument and the testator's signature in deep black.

This is certainly remarkable, but in view of the evidence given by these two men, Hogan and Chiucovich, uncontradicted and unimpeached, the court is not at liberty to find that there were not two kinds on the table and that they happened to select the blue and testator used the black.

My own impression is that William Conklin prepared the paper some time in advance of its final execution and that testator signed it without date, and that it was so signed when the subscribing witnesses were requested to witness the instrument by decedent; but I am not at liberty judicially to poise my personal impression against the solemn statement under oath of two reputable witnesses to the factum. I must conclude, therefore, that so far as the legal mechanism of the transaction is concerned, the conditions of the statute were observed.

Bernard Conway, a witness for contestant, testified that the decedent told him about six months before his death that William Conklin had induced him to sign a paper without knowing its contents. That conversation could not have concerned this disputed document, unless the subscribing witnesses have sworn falsely, for they testify that testator declared that this was his "first and last will," and, without discrediting Conway, his statement cannot be referred to this instrument, and the court is not permitted to consider in this connection any other paper than the one propounded.

Decedent was a native of Placer county, California, and appears to have had no knowledge of or acquaintance with his collateral relatives, save one uncle, who predeceased him. In the absence of proof to the contrary, it may be presumed that he had none such when he made his will; but assuming that he had avuncular relatives and that their existence was known to him, he was under no obligation ordinarily to make testamentary provision for them.

The supreme court has decided that an uncle is not bound to provide for his nephew; and, conversely, the nephew has no legal burden imposed upon him as to his uncle. A failure so to provide is neither unnatural nor necessarily undutiful, especially where the person unprovided for is unknown or thousands of miles distant, and where no communication or

correspondence passed between such collateral relative and testator.

It has been testified that decedent said he had relatives in the eastern states whom he did not know, but that he had a friend to whom he intended leaving his property, and that friend was Frank Conklin.

It has been shown that Conklin was a friend of the family; that when the father of decedent died he requested Conklin to go on his bond; this undertaking was fixed at $3,500 by the court, Conklin procured another surety and both qualified and letters thereupon issued.

After installation decedent administrator made an arrangement in writing with his surety, whereby it was agreed between decedent, both individually and as administrator of the estate of Daniel Mahoney, deceased, that the value of the services of Conklin theretofore rendered, and thereafter to be rendered in and about the said estate, were fixed at the rate of $12.50 per month, the allowance to date from the 9th day of February, 1897, the date of the issuance of letters of administration in the estate. It was further agreed between the parties that when the financial condition of the estate should allow, Conklin should from time to time draw from the moneys collected on rents, the said sum of $12.50 per month, and that such payments should be credited by him on the said account. The date of this agreement was June 18, 1900.

Decedent was advised to this course by his attorney, who thought it prudent because of his client's liability to lapse into the liquor habit. Thereafter decedent made the establishment of Conklin his headquarters, went there to read the newspapers, spending a considerable portion of his time there, assisted in keeping or making entries in their order books, and rendered various voluntary services to the concern. He had a room in the house belonging to the estate and ate his meals at a refectory of his own selection.

Conklin kept the interest on the mortgages paid, so as to avoid foreclosure, paid decedent's bills, gave small sums to him according to his needs, took receipts for the amounts paid, as a cautious man should, so that there might be no disputes

thereafter; many receipts for money paid on decedent's account were made out in Conklin's name, he having paid them out of the funds collected. The account filed shows the payments made to decedent; he was an heir; the creditors had a right to know how much was being advanced to the decedent as the surety was responsible to them on his bond, and the account would enable them to see what was done with the money. The productive property of the estate was preserved intact, the drain of interest lessened; the funeral expenses of father and sister were paid; foreclosure averted; a net income of $125 a month assured.

Conklin collected and disbursed money as any ordinary real estate agent would have done, and received and paid it as any banker might have done, and he advised decedent as to his property affairs as a friend. He had no power to sell or lease, decedent alone under the sanction of the court could do this, and in the strict sense, as defined by law lexicons, the relation was not confidential or fiduciary.

"Fiduciary" and "confidential" relation seem to be used by the courts and law-writers as convertible expressions. It is a peculiar relation which exists between client and attorney, principal and agent, principal and surety, landlord and tenant, parent and child, guardian and ward, ancestor and heir, husband and wife, trustee and cestui que trust, executors and administrators and creditors, legatees, or distributees, appointer and appointee under powers, partner and part owners. In these and like cases the law, to prevent undue advantage from the unlimited confidence, affection or sense of duty which the relation creates, requires the utmost of good faith in all transactions between the parties.

According to the evidence adduced by proponent decedent appreciated the assistance of Conklin and declared that he was pleased to have such a man manage his property, because if he had got into the hands of some of those "sharks of lawyers" he would have had nothing left in a year or two; Conklin's management was conservative and justified his selection as manager.

It has been said by supreme judicial authority that the very considerations which must be removed in transactions inter

vivos—friendship, trust and confidence, personal obligations —may and generally do justly and properly give direction to testamentary dispositions.

The case of Bancroft v. Otis, 91 Ala. 279, 24 Am. St. Rep. 904, 8 South. 286, is the best considered case we have been able to find on this point. One of the points therein decided is that the mere existence of confidential relations between the testator and the principal beneficiary under his will, who is also the proponent, does not raise the presumption that the will was procured by the exercise of undue influence, nor impose on the proponent the burden of disproving undue influence, fraud, or coercion; there must be, in addition to that fact, evidence of his active interference in procuring the execution of the will, before that presumption arises.

There is no evidence in the case at bar that the proponent initiated the preparation of this instrument, or wrote it himself or dictated its terms, or gave directions as to its contents to the draftsman, or selected the witnesses to be present at its execution, or the like; or, in short, that the proponent-beneficiary was as a matter of fact active in respect to or in any way connected with the preparation and execution of the will.

If a presumption shall be indulged, it is rather in favor of a will when the testator leaves property to one with whom he had intimate and confidential relations during life, as it is usually designed to give property to those whom the testator desires to favor. A bequest of all of testator's property to one intimately connected socially and in business with him for years as a partner has been upheld by our supreme court. In such a case no presumption of undue influence can arise, unless the relation is used to procure the testamentary benefit. This is the result of all the authorities.

Decedent declared to several witnesses his intentions, and these declarations were admissible to establish freedom of volition and exemption from undue influence and to maintain the testamentary instrument as having been made in consonance with the wishes of the testator.

Proponent was not present when the document was drawn, nor when it was executed; he did not speak to decedent at any

time about making a will; and, hence, no presumption of undue influence can arise as to him operative upon the act. Certainly, as has been said by an appellate court, one cannot be called upon to prove that a transaction with which he had nothing to do was a fair one.

Even if proponent-beneficiary were present at the time of the transaction, unless he spoke to the testator about the will, no presumption arises. So said the supreme court in the Estate of Nelson, 132 Cal. 193, 64 Pac. 294.

It does not appear from the evidence that anyone spoke to decedent in reference to the manner in which he should dispose of his property or gave any suggestions in regard thereto.

It is true that the fraternal relations and intimacy in family and business between the draftsman of the document and the proponent-beneficiary and the improbable narrative of William Conklin as to the manner in which the instrument was composed from the dictation of decedent, who read from some paper in his pocket, which he replaced therein after he had finished, and the story of the finding of the will after the death of the testator suggest suspicion. All these statements seem dubious, if not apocryphal, in substance and circumstance, and might challenge credence as to other features of the proponent's case, if the court were free to consider them as against positive and trustworthy testimony, but the verdict or judgment may not rest on surmise, suspicion or conjecture, howsoever strong.

It is true that it is difficult to prove undue influence by direct evidence; in the nature of such an issue inheres a hardship which the court cannot relieve unless there is testimony so clear, convincing, and preponderant as to leave no alternative; but the case here made for contestant is not of that character. The will was executed properly and the attesting witnesses selected by the testator himself proved the soundness of his mind and its freedom from undue influence and fraud. Judgment for proponent.

----

*As to Intoxication* as affecting testamentary capacity, see Estate of Hill, 1 Cof. Prob. Dec. 380, and note.

## ADJUDICATION OF INCOMPETENCY AS SHOWING WANT OF TESTAMENTARY CAPACITY.

An adjudication of insanity is admissible in evidence where testamentary capacity is in issue, but it is not conclusive of the question, although the adjudication was made prior to the execution of the will. Even then it is no more than presumptive or prima facie evidence of incapacity, throwing the burden of proof on the proponents of the will: Estate of Johnson, 57 Cal. 529; Mileham v. Montagne, 148 Iowa, 476, 125 N. W. 664; Hawkins v. Grimes, 52 Ky. (13 B. Mon.) 257; Whitenack v. Stryker, 2 N. J. Eq. 8; Brady v. McBride, 39 N. J. Eq. 495; In re Pendleton's Will, 1 Con. 480, 5 N. Y. Supp. 849; In re Widmayer's Will, 34 Misc. Rep. 439, 69 N. Y. Supp. 1014, affirmed, 74 App. Div. 336, 77 N. Y. Supp. 663; Hart v. Deamer, 6 Wend. (N. Y.) 497; Demelt v. Leonard, 19 How. Pr. 140, 11 Abb. Pr. 253; L'Amoureux v. Crosby, 2 Paige Ch. 422, 22 Am. Dec. 655; Osterhout v. Shoemaker, 3 Hill, 513; Van Deusen v. Sweet, 51 N. Y. 378; Wheeler v. State, 34 Ohio St. 394, 32 Am. Rep. 372; Titlow v. Titlow, 54 Pa. 216, 93 Am. Dec. 691; Hottle v. Weaver, 206 Pa. 87, 55 Atl. 838; Sergeson v. Sealey, 2 Ark. 26, Eng. Reprint, 648; Kerr v. Lunsford, 31 W. Va. 659, 2 L. R. A. 668, 8 S. E. 493.

A person for whom a guardian has been appointed on the ground of insanity or incompetency is not necessarily incompetent to make a will but ordinarily the existence of the guardianship raises a presumption against his testamentary capacity. This presumption, however, is rebuttable, and can be overthrown by those who seek to uphold the will if they produce satisfactory evidence that at the time of the execution of the testamentary instrument the testator possessed the requisite degree of mental capacity: Estate of Hill, 1 Cof. Prob. Dec. 380; Lucas v. Parsons, 27 Ga. 593; Stevens v. Stevens, 127 Ind. 560, 26 N. E. 1078; Harrison v. Bishop, 131 Ind. 161, 31 Am. St. Rep. 422, 30 N. E. 1069; Pepper v. Martin, 175 Ind. 580; 92 N. E. 777; In re Fenton's Will, 97 Iowa, 192, 66 N. W. 99; Breed v. Pratt, 35 Mass. (18 Pick.) 115; Stone v. Damon, 12 Mass. 488; Crowninshield v. Crowninshield, 68 Mass. (2 Gray) 524; Rice v. Rice, 50 Mich. 448, 15 N. W. 545; King v. Gilson, 191 Mo. 307, 90 S. W. 367; Ames v. Ames, 40 Or. 495, 67 Pac. 737; Estate of Hoffman, 209 Pa. 357, 58 Atl. 665; In re Wheelock's Will, 76 Vt. 235, 56 Atl. 1013; In re Cowdry's Will, 77 Vt. 359, 3 Ann. Cas. 70, 60 Atl. 141; Will of Slinger, 72 Wis. 22, 37 N. W. 236.

Mere intellectual feebleness must however, be distinguished from unsoundness of mind. It is a well-known fact that many persons, especially elderly people, are willing to have a guardian, but are not willing to submit to an adjudication that would class them as insane. This fact prompted an amendment to the Vermont statute, which amendment recognized a difference between a non compos, and his class, and a person who merely lacks the mental capacity to take care of himself or his property. While the mind of a non compos is

to be taken prima facie as insane and nondisposing, the mere adjudication of a person's mental incapacity to take care of himself and his property, and the appointment of a guardian thereunder does not render him prima facie mentally incapable of making a will: In re Cowdry's Will, 77 Vt. 359, 3 Ann. Cas. 70, 60 Atl. 141.

The incapacity of guardianship is simply a fact, which may be proved like any other fact tending to establish mental incapacity, but it does not work an estoppel upon the proponent of a will: In re American Board etc. for Foreign Missions, 102 Me. 72, 66 Atl. 215; Breed v. Pratt, 35 Mass. (18 Pick.) 115.

It seems to be clear, then, that one's mental powers may be so far impaired as to incapacitate him from the active conduct of his estate, and to justify the appointment of a guardian for that purpose, and yet have such capacity as will enable him to direct a just and fair disposition of his property by will; and that one who has been adjudged to be of unsound mind and placed under guardianship is not necessarily incompetent to make a will, though such adjudication has never been set aside: Harrison v. Bishop, 131 Ind. 161, 31 Am. St. Rep. 422, 30 N. E. 1069; but he must in fact be of sound mind at the time of its execution: Breed v. Pratt, 35 Mass. (18 Pick.) 115; it being observed, however, that the requirements of a "sound and disposing mind" do not imply that the powers of the mind may not have been weakened or impaired by old age or bodily disease: In re American Board etc. for Foreign Missions, 102 Me. 72, 66 Atl. 215.

Even where a person under guardianship as non compos mentis makes a will appointing his guardian executor, and giving him a legacy, the fact of guardianship does ont estop the executor from showing that the testator, at the time of making his will, was of sound and disposing mind and memory: Breed v. Pratt, 35 Mass. (18 Pick.) 115.

A will may be made by a lunatic under guardianship, who has been restored to his reason, although the letters of guardianship have not been repealed: Stone v. Damon, 12 Mass. 488. The case of McAllister v. Rowland, 124 Minn. 27, Ann. Cas. 1915B, 1008, 144 N. W. 412, "holds that the adjudication of a person's incompetency made subsequent to the execution of a will by him is admissible in evidence as bearing on the question of testamentary capacity. This point has been similarly decided in other jurisdictions: In re Loveland, 162 Cal. 595, 123 Pac. 801 (twelve days after); Kerr v. Lunsford, 31 W. Va. 659, 8 S. E. 493, 2 L. R. A. 668 (seventeen months after). See, also, Spiers v. Hendershott, 142 Iowa, 446, 120 N. W. 1058 (ten months after); Rice v. Rice, 50 Mich. 448, 15 N. W. 545 (few hours after); Whitenack v. Stryker, 2 N. J. Eq. 8. Compare In re Harvey (Iowa), 94 N. W. 559 (two years after). And in some cases, the courts seem to have received such evidence without passing on the specific question of its admissibility: Schmidt's Succession, 125 La. 1065, 52 South.

160 (seventeen months after); Brady v. McBride, 39 N. J. Eq. 495 (three years after); Titlow v. Titlow, 54 Pa. St. 216, 93 Am. Dec. 691 (seven months after); Russell v. Lefrancois, 8 Can. Sup. Ct. 335 (six weeks after). See, also, Ames v. Ames, 40 Or. 495, 67 Pac. 737 (few hours after).

It is said in the reported case that there is no difference, on the question of admissibility, between a subsequent adjudication of insanity and a subsequent guardianship appointment based on infirmity, debility or incapacity. This is probably true in the jurisdictions wherein subsequent adjudications are receivable in evidence: See In re Loveland, 162 Cal. 595, 123 Pac. 801; Spiers v. Hendershott, 142 Iowa, 446, 120 N. W. 1058. See, also, Ames v. Ames, 40 Or. 495, 67 Pac. 737. Compare In re Harvey (Iowa), 94 N. W. 559. However, a subsequent guardianship proceeding not taken on the issue of insanity, has been said to be "without important bearing" on the question of testamentary capacity: Rice v. Rice, 50 Mich. 448, 15 N. W. 545.

In the case of In re Loveland, supra, wherein it appeared that the adjudication of incompetency was made within eleven or twelve days after the execution of the will, the court said: "But, in addition, we have the adjudication of incompetency, following closely upon the execution of the will. There is no need to discuss appellants' claim that this adjudication was not conclusive on the question of Loveland's competency to make a will. The lower court did not assume to give it such effect. What it did was to admit such adjudication in evidence as showing that at the date of the adjudication, Loveland was so far incompetent as to justify the appointment of a guardian. This may not establish the want of capacity sufficient for the making of a will (Rice v. Rice, 50 Mich. 448, 15 N. W. 545), and of course could not fix the status of the person affected as incompetent to make a will on a date prior to that of the adjudication. But it is certainly evidence proper to be considered on the issue of want of testamentary capacity at the time of the appointment of the guardian. . . . And where there is testimony tending to show that the mental condition of the person has not changed between the date of the act in question and the appointment of a guardian, the appointment, although later in time, is admissible on the issue of capacity when the act was done. Here the connection between the time of the incompetency proceedings and that of the making of the will was sufficiently established both by direct testimony that the mental condition of Loveland had not changed in the interval separating the two dates and by the general aspect of the case, indicating, as it did, that any mental weakness on the part of Loveland was the result of that gradual decay which sometimes accompanies advanced age." And in Spiers v. Hendershott, supra, wherein it appeared that the contested will was executed in January, 1898, it was said: "The trial court permitted the contestants to introduce in evidence the record

of the guardianship proceedings whereby a guardian was appointed for the testatrix in November, 1898. Instruction No. 14 instructed the jury that they might consider such evidence in determining the mental condition of the testatrix at the time of making the will, and at the time of the alleged revocation. Appellants complain of the instruction, in that it failed to state to the jury that the appointment of such guardian was presumptive evidence of mental incapacity to make a will. Granting the contention that the order of the appointment of guardian created a presumption of mental incapacity on the part of the testatrix to make a will, such legal presumption could not relate back to a time antedating the proceeding resulting in such appointment. The appointment of a guardian did create a presumption of mental incapacity as of that time, and the fact was proper for the consideration of the jury on the question of mental incapacity as of the time the will was made, but the legal presumption as such could not relate back to the date of the will." In Kerr v. Lunsford, 31 W. Va. 659, 2 L. R. A. 668, 8 S. E. 493, wherein a will made by one Lewis Lunsford on April 27, 1881, was in contest, the court said: "The contestants offered in evidence an order made by the circuit court of Ohio county on the 4th day of October, 1882, adjudicating the said Lewis Lunsford to be insane and appointing a committee for him, with the petition and notice for said appointment; but the court refused to admit any of the papers except the notice and so much of the order as adjudicated, that said Lunsford was insane and appointed a committee for him. The contestants excepted. . . . What was properly the record of the inquisition, de lunatico inquirendo was proper evidence. . . . The last part of the order relating to the duties of the 'committee' is properly no part of the inquisition, and the court did not err in refusing to permit it to be read in evidence."

In New York, in Van Guysling v. Van Kuren, 35 N. Y. 70, evidence of the adjudication of a testator's insanity, made eight months after the execution of the will, seems to have been admitted. And in the case of In re Widmayer, 74 App. Div. 336, 77 N. Y. Supp. 663, evidence of a finding of incompetency, confirmed three weeks subsequent to the execution of the will, but made one week prior thereto, was received. In the case of In re Preston, 113 App. Div. 732, 37 Civ. Pro. 165, 99 N. Y. Supp. 312, it appeared that the will in contest was executed in March and that the testator was adjudged incompetent in December, following. The court said: "The ruling of the surrogate admitting that portion of the inquisition finding Preston [the testator] incompetent for more than a year prior to the time it was taken, was erroneous. Section 2335 of the Code of Civil Procedure expressly limited and confined the inquiry as to the competency of Preston to the time of the hearing, which was December 6, 7 and 8, 1904. It is immaterial that the petition upon which the proceeding was instituted omitted the word 'lunacy,' and alleged

incompetency arising from old age, loss of memory, and understanding as its basis, as the word 'lunacy' as used in section 2335 of the code, under the provisions of section 7 of the Statutory Construction Law (Laws 1892, c. 677), evidences all phases of alleged incompetency, except idiocy, including imbecility arising from old age and loss of memory or understanding."

Some jurisdictions have declined to admit, on the issue of testamentary capacity, an adjudication of incompetency, made subsequent to the execution of the will: Terry v. Buffington, 11 Ga. 337, 56 Am. Dec. 423 (five years after); Taylor v. Taylor, 174 Ind. 670, 93 N. E. 9 (five years after); Watson v. Watson, 137 Ky. 25, 121 S. W. 626 (six months after). See, also, Entwistle v. Meikle, 180 Ill. 9, 54 N. E. 217 (two or three years after). Compare Hawkins v. Grimes, 13 B. Mon. (Ky.) 257. In Terry v. Buffington, supra, referring to an adjudication of incompetency made five years after the execution of the will, the court said: "Had the insanity of the testator been legally established before the will was made, its continuance would have been presumed, and the onus cast upon the propounders of the will, to show that the disqualification had been reversed. The maxim is, semel furibundus semper furibundus praesumitur. The converse of the proposition, however, or the doctrine of relation back, does not hold in such cases. The strongest objection, perhaps, to the admissibility of this judgment of lunacy is that it is res inter alios acta. The record does not disclose that the propounders of the will were parties or privies to that proceeding."

One jurisdiction, in declining to receive such evidence, has indicated that it might be admissible when closely connected in point of time with the execution of the will: Taylor v. Taylor, 174 Ind. 670, 93 N. E. 9.

The rule for exclusion seems to gain emphasis in case the subsequent adjudication is based on infirmity or incapacity rather than on insanity: See Entwistle v. Meikle, 180 Ill. 9, 54 N. E. 217; Watson v. Watson, 137 Ky. 25, 121 S. W. 626. In Entwistle v. Meikle, supra, the court said: "The appellants offered in evidence the record of the county court of Ford county to show that in 1896 or 1897—two or three years after the execution of the will—a conservator was appointed over the estate of James Entwistle. The court excluded the evidence and this ruling is relied upon as error. The fact that a conservator was appointed some two or three years after the will was executed would not establish the fact that the testator did not have sufficient mental capacity to make a will. The question in issue on the trial was as to the testamentary capacity of the testator on May 31, 1894—not whether, under chapter 86 of the Revised Statutes, there should be appointed a conservator to take charge of his property to prevent him from dissipating or wasting his estate, and the determination of the latter question would not settle the former. Conceding that the appointment of a conservator was proper. it does not

follow that the testator did not possess testamentary capacity to make a will. It may be that the record of the county court had a remote bearing on the question, but it was so remote that it was not error to exclude it from the consideration of the jury." In Watson v. Watson, supra, it was said: "The court allowed the contestants to read to the jury the verdict and judgment finding him mentally incompetent to manage his estate by reason of infirmity and age in August, 1906. This was error. It takes less capacity to make a will than to transact business generally. A person may by reason of infirmity and age be mentally incompetent to look after a farm and attend to business transactions of this sort when he would be entirely competent to make a will. At the time the inquest was held he was sick in bed, and too sick to be moved from the house for some weeks after the inquest. A man in this condition might well be in the judgment of a jury incompetent from age and infirmity to take care of his estate. This was not the issue to be tried here. The question here is: Had he testamentary capacity in February, 1906? The verdict of the jury found six months later upon a different issue would serve only to confuse and mislead the jury, and should not have been admitted."